## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THE JAMES STREIBICH REVOCABLE
TRUST OF 2002, et al.,

         Plaintiffs,

         v.

BROCK H. FLAGSTAD, et al.,

         Defendants.

No. 20 CV 2242

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Brock Flagstad persuaded the James Streibich Revocable Trust to invest in his crypto-currency and securities trading company, Folding Light, LLC. Flagstad assured the Trust that its funds would be used only for trading purposes—to help develop Folding Light's cutting-edge financial technology and to attract more investors. The pitch was a ruse, according to the Trust; in fact, Flagstad and a web of LLCs under his control fraudulently schemed to funnel the Trust's investment into Flagstad's own pockets. The Trust, individually and derivatively on behalf of Folding Light, sues Flagstad and the LLCs (Oxford Marketing Partners, Oxford Media, Oxford Tax Partners, Oxford FG, Oxford GP, Financial Freedom Advisors, and Cloverpoint Partners). Plaintiffs bring claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)–(d), and Illinois law. Defendants move to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6). The motion is granted.

## I.    Legal Standards

A complaint must contain a short and plain statement that plausibly suggests a right to relief. Fed. R. Civ. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). To survive a motion to dismiss, a plaintiff must allege facts that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). I accept all factual allegations as true and draw all reasonable inferences in plaintiffs' favor, but I disregard legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Iqbal*, 556 U.S. at 678. Plaintiffs must provide "more than labels" or "a formulaic recitation of a cause of action's elements," *Twombly*, 550 U.S. at 555, and the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562.

Plaintiffs alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b). When, as here, "predicate acts of racketeering involve fraud, the complaint must describe the 'who, what, when, where, and how' of the fraudulent activity to meet the heightened pleading standard demanded by Rule 9(b)." *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) (quoting *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019)). When a plaintiff brings RICO claims against multiple defendants, "Rule 9(b) requires a RICO plaintiff to plead sufficient facts to notify each defendant of his alleged participation in the scheme." *Goren v. New Vision International, Inc.*, 156 F.3d 721, 726 (7th Cir. 1998).

## II.    Background

Brock Flagstad is the dominant member and controls the finances of many limited liability companies; the companies generally share the same accountant, law firm, address, and business model. [42] ¶¶ 14–16.[1] The corporate defendants are all Flagstad-controlled LLCs with the same downtown-Chicago address. *Id*. ¶¶ 5–11.

Around May 2018, Flagstad approached James Streibich (the Trust's trustee) to solicit investment in Folding Light. *Id*. ¶ 17. Flagstad was a member of Folding Light and its lead manager. *Id*. ¶ 4. Flagstad told Streibich that Folding Light had developed an innovative proprietary trading platform for securities, bitcoin, and other crypto-based currencies. *Id*. ¶ 17. Flagstad also said that the platform was unique in the financial-technology industry, that "back testing" had already shown significant returns, and that the Trust's capital would help Folding Light demonstrate actual returns, attract other investors, and leverage the trading investment at multiple times its value. *Id*.

Flagstad told Streibich that in exchange for a $2,000,000 investment, the Trust would gain a preferred interest in Folding Light. *Id*. ¶ 18. He promised that the Trust's funds would be used only for trading purposes. *Id*. When Streibich told Flagstad that he was interested in investing, Flagstad again affirmed that the Trust's investment would be used solely for trading purposes. *Id*. ¶ 19. In reliance on

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. Facts are taken from the first amended complaint, [42], and plaintiffs' opposition to the motion to dismiss, [51].

Flagstad's representations, the Trust invested the $2,000,000 and received a preferred-capital membership interest in Folding Light. *Id.*

A few weeks later—at Flagstad's direction—Folding Light began transferring funds to Flagstad and Financial Freedom Advisors (a Flagstad company). *Id.* ¶ 20. Over the next two months, Flagstad and FFA received hundreds of thousands of dollars in transfers from Folding Light. *Id.* Later that fall, Folding Light's trading team left to start a competing company. The split was not amicable: Folding Light and the former trading team members "blamed each other for absconding with … funds." [51] at 8. Litigation followed, where the traders alleged that Flagstad had converted over $340,000 from Folding Light to FFA. [42] ¶ 20. The Trust asked Flagstad about the alleged conversion, but he denied it. *Id.* ¶ 21.

With Folding Light's trading operations at a standstill following the team's departure, Flagstad approached Streibich about establishing a revolving credit line with Folding Light. *Id.* Streibich agreed to loan $200,000 to Oxford Marketing (another Flagstad Company), with interest payable monthly to Folding Light. Oxford Marketing made the first four monthly interest payments to Folding Light and then stopped. *Id.*

By summer of 2019, Folding Light had halted operations and Flagstad moved from Chicago to Sea Island, Georgia. *Id.* ¶ 22. Flagstad retained complete control over Folding Light's books, yet he repeatedly ignored the Trust's requests to share the company's financial information. *Id.* ¶¶ 22, 27, 76. When Flagstad continued to stonewall the Trust, Streibich sought and obtained partial account information from

4

one of Folding Light's banks. *Id*. ¶ 28. The records showed that, from June 2019 until February 2020, Flagstad made nineteen cash wire transfers—totaling just over $849,000—from Folding Light into two bank accounts. *Id*. ¶¶ 28–29. Flagstad did not notify Folding Light's members or management committee of the transfers, and he did not seek the Trust's consent to a related-party transaction (as he had with the revolving credit line). *Id*. ¶ 28. Plaintiffs allege that defendants created phony invoices and expense records to substantiate cash transfers from Folding Light to Oxford Media, FFA, and other defendants. *Id*. ¶¶ 26, 76.

The facts above were in the original complaint, but the amended complaint offers some new allegations. First, from January 2019 until at least August 2020, the corporate defendants paid $5,290,780.72 to American Express for Flagstad-incurred charges. *Id*. ¶¶ 30, 106, 111. Second, Channel Clarity, LLC (another Flagstad company but not a defendant here), paid $625,762.87 to American Express for Flagstad-incurred charges. *Id*. ¶ 30. These American Express expenses "in whole or in part, [were] not legitimate business expenses." *Id*. The complaint adds that Flagstad paid over $5 million in American Express bills "with cash proceeds from the Enterprise." *Id*. ¶ 78. Third, plaintiffs assert that in April 2020, Oxford Marketing and Oxford Tax fraudulently obtained over $640,000 in forgivable, government-backed loans through Wintrust Financial (via the Small Business Administration's Paycheck Protection Program). *Id*. ¶¶ 42–73. Flagstad signed the PPP-loan applications as the authorized representative of Oxford Marketing and Oxford Tax. *Id*. ¶¶ 52, 67. The applications inflated employee and payroll information to obtain

5

the loans, and then used the loan proceeds "in furtherance of the Enterprise's goal to enrich Flagstad." *Id*. ¶¶ 50, 56, 65, 71. According to plaintiffs, the American Express charges and the loan applications show that Flagstad "is continuing to engage in mail fraud, wire fraud, and bank fraud in order to obtain money for the Enterprise." *Id*. ¶ 78. Finally, plaintiffs allege, upon information and belief, that Flagstad and Cloverpoint engaged in offshore banking "to secrete fraudulently obtained funds from the Trust." *Id*. ¶¶ 79, 110. In total, Flagstad received at least $1.5 million in cash payments from January 2019 to August 2020. *Id.* ¶ 25.

The amended complaint posits that Flagstad and the corporate defendants collectively agreed to commit, and subsequently committed, a pattern of racketeering activity to defraud plaintiffs, banks, the government, and other victims. Plaintiffs bring RICO and RICO-conspiracy claims, 18 U.S.C. § 1962(c)–(d) (Counts I & II), along with five state law claims: common law fraud (Count III), conversion/theft (Count IV), breach of fiduciary duty (Count V), breach of contract (Count VI), civil conspiracy (Count VII), and a demand for an accounting (Count VIII).

This is plaintiffs' second attempt to state a RICO claim. I dismissed the original complaint without prejudice because plaintiffs had failed to adequately allege the elements of a substantive RICO claim or a RICO conspiracy. *See* [40] at 5–14. The question now is whether the new facts about American Express payments, federal PPP loans, and offshore banking push the complaint's RICO claims over the plausibility line.

### III.    Analysis

### A.    Racketeer Influenced & Corrupt Organizations Act

RICO makes it "unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To state a § 1962(c) claim, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Menzies*, 943 F.3d at 336 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985)). A plaintiff must do more than allege the above elements in a "boilerplate fashion;" a plaintiff must "allege sufficient facts to support each element." *Goren*, 156 F.3d at 727.

### 1.    Enterprise

Without an enterprise, there can be no RICO claim. A RICO enterprise can be a formal legal entity (including any partnership, corporation, or association), or an informal "group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise must have an ascertainable structure, but it "need not have any structural features beyond 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *United States v. Brown*, 973 F.3d 667, 682 (7th Cir. 2020) (quoting *Boyle v. United States*, 556 U.S. 938, 946 (2009)). "Despite the expansive nature of this definition, it is not limitless." *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853 (7th Cir. 2013). The enterprise's purpose must be "a

common purpose of engaging in a course of conduct," *United States v. Turkette*, 452 U.S. 576, 583 (1981), and "separate from the predicate acts themselves." *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991). A RICO plaintiff must identify "a truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015). The enterprise element prevents "every conspiracy to commit fraud that requires more than one person to commit" it from becoming a RICO violation. *Id.* (quoting *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 676 (7th Cir. 2000)).

Accordingly, a plaintiff must "identify a 'person'—*i.e.*, the defendant—that is distinct from the RICO enterprise." *United Food & Commercial Workers*, 719 F.3d at 853. A "person" may be a natural person or an entity "capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A plaintiff must show that each RICO defendant "conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993); *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009) ("[A]n association-in-fact enterprise must be meaningfully distinct from the entities that comprise it such that the entity sought to be held liable can be said to have controlled and conducted the enterprise rather than merely its own affairs."); *Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004) ("Without a difference between the defendant and the 'enterprise' there can be no violation of RICO."). As such, an enterprise must be more than a group of associated businesses that operate in concert under one person's

8

control, and "naming of a string of entities does not allege adequately an enterprise." *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 646 (7th Cir. 1995).

Plaintiffs argue that Flagstad and the corporate defendants are distinct persons, and that together, they form an association-in-fact enterprise. *See* [42] ¶¶ 115–116; [51] at 11. Flagstad did not act alone, plaintiffs say, but rather acted in concert with the corporate defendants. [51] at 11–12. The enterprise's purpose, according to the amended complaint, is to "engage in financial fraud … to enrich Flagstad." [42] ¶ 116; *see also id*. ¶¶ 24, 32, 56, 71, 123. As for relationships among members, the complaint alleges that Flagstad controls each of the corporate defendants and that the defendants have communicated with one another to execute cash transfers and obtain loans with a shared goal: Flagstad's enrichment. *See id*. ¶¶ 5–11, 123–124. Plaintiffs assert that the enterprise has been ongoing since May 2018. [51] at 9.

Like the original complaint, the amended complaint does not plausibly suggest the existence of an association-in-fact enterprise with a purpose separate from the predicate acts. Flagstad's personal enrichment through fraud is not a purpose on behalf of an enterprise distinct from the individual defendants' motives to commit predicate acts. Rather, it shows only that the defendants committed fraud together, but that is not enough to separate predicate acts from an enterprise. Plaintiffs say that defendants acted in concert and performed certain assigned roles, but these conclusory allegations "do not allow a plausible inference that the defendants worked together for the same unlawful purpose." *Sheikh v. Wheeler*, 790 Fed. App'x 793, 796

(7th Cir. 2019). Instead, while Flagstad is at the center of all of the amended complaint's allegations, those allegations "contain different actors for each event" and "do not indicate how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct." *Rao v. BP Products North America, Inc.*, 589 F.3d 389, 400 (7th Cir. 2009). The mere fact that "that the defendants had a commercial relationship" due to Flagstad's control over each entity does not imply that "that they had joined together to create a distinct entity for [RICO] purposes." *United Food & Commercial Workers*, 719 F.3d at 855. In short, plaintiffs still fail to separate the enterprise from the predicate acts.

The alleged enterprise also is not distinguishable from the defendants. *See id.* at 853–54 (the enterprise must be distinct from the defendant). According to the amended complaint, Flagstad and the corporate defendants constitute a RICO enterprise because "[t]heir association encompassed an enterprise for the commission of at least two predicate acts of racketeering activity" with the purpose of engaging in "financial fraud … to enrich Flagstad." [42] ¶¶ 115–116. But like the original complaint, this conclusory allegation shows only that defendants wanted to commit crimes. It does not suggest an enterprise's separate existence and fails to separate the enterprise from a person. Advancing Flagstad's self-interest is not a purpose that gives separate existence to an enterprise and does nothing to separate Flagstad from the purported enterprise. Nothing in the amended complaint—including the allegations of illegitimate credit card payments, fraudulent bank loans, and offshore banking—reveals how "actions were undertaken on behalf of the *enterprise*" and not

10

by defendants' "in their individual capacities, to advance their individual self-interests." *United Food & Commercial Workers*, 719 F.3d at 854. That is, the new allegations that Flagstad and some of the corporate defendants committed other crimes do not suggest that those crimes were committed on behalf of a distinct enterprise. The amended complaint contains ample allegations of Flagstad's misconduct, but "it falls short of plausibly alleging the type of concerted activity undertaken on behalf of an identifiable enterprise necessary to a successful RICO claim." *Id.* at 850–51.

While plaintiffs also claim that the alleged enterprise made it easier for defendants to commit the predicate acts, *see Emery v. American General Finance, Inc.*, 134 F.3d 1321, 1324 (7th Cir. 1998), they do not explain how. The complaint describes conduct that might plausibly state a claim for fraud against Flagstad, but RICO does not penalize isolated criminal activity or garden-variety fraud. *See Menzies*, 943 F.3d at 337 (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992). Plaintiffs have failed to allege that any defendant used a distinct enterprise to engage in a pattern of racketeering activity. *See Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010) (RICO creates liability for "*using* an enterprise to engage in a pattern of racketeering activity").

Finally, plaintiffs emphasize that the corporate defendants are legally distinct from Flagstad, and while that's certainly true, it gets plaintiffs no closer to alleging an association-in-fact enterprise. Plaintiffs rely on *Cedric Kushner Promotions, Ltd.*

11

*v. King*, 533 U.S. 158 (2001), which held that, under RICO, the president and sole shareholder of a closely held corporation is distinct from the corporation itself (the enterprise) "even where the employee is the corporation's sole owner." *Id*. at 163. *Cedric*, however, addressed "a claim that a corporate employee is the 'person' and the corporation is the 'enterprise,'" which is "quite different" from "a claim that a corporation was the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.'" *Id*. at 164. In other words, when a corporation itself is the RICO enterprise, its sole owner is a person distinct from the enterprise. But *Cedric* did not address plaintiffs' theory here: whether a group of companies with their common owner constitute an association-in-fact RICO enterprise when they commit crimes at their owner's direction. There is no dispute that Flagstad and the corporate defendants are distinct persons under RICO. *See* [55] at 9. But that fact—and the fact that corporate defendants had other members and employees—does not suggest that the defendants together formed an association-in-fact enterprise with a distinct purpose, relationships, and longevity.

In sum, plaintiffs have not identified an enterprise with a common purpose separate from a person or the predicate acts.

### 2.    *Conduct (Operation or Management)*

A RICO plaintiff must also show that each defendant "participated in the operation or management of the enterprise itself" and therefore played "some part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179, 183. The "operation-or-management requirement does not necessarily limit the scope of liability to an

12

enterprise's upper management," but "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c)." *Patel*, 986 F.3d at 698–99 (quoting *Goren*, 156 F.3d at 728); *see also Crichton*, 576 F.3d at 399 ("Allegations that a defendant had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise do not suffice."). Thus, RICO liability does not attach for mere association with an enterprise; one must "somehow operate or manage the enterprise." *Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961, 966 (7th Cir. 2000). Here, plaintiffs argue that the corporate defendants conducted the affairs of an enterprise because they received unauthorized wire transfers and "implemented Flagstad's decision to use unauthorized banking activity to defraud investors." [51] at 14. Plaintiffs also claim that the new bank fraud allegations—connected to the PPP loans—show that Oxford Marketing and Oxford Tax assisted Flagstad in committing bank fraud. *Id.* at 14–15.

But the amended complaint still does not allege facts showing that anyone other than Flagstad managed or operated anything. Plaintiffs level specific allegations against only Flagstad. Flagstad made false promises when he solicited the Trust's investment, transferred the funds from Folding Light to himself and other defendants, and obtained a loan from the Trust on behalf of Oxford Marketing. Flagstad "directed" the defendants to "engage in a scheme to defraud investors, banks, and the government." [42] ¶¶ 73–74. To feed his personal need for cash, Flagstad "orchestrated the theft of millions in funds … to transfer cash between the

13

Defendants" to "maintain an image of financial success … to continue to defraud other investors." *Id*. ¶¶ 31, 75. "Flagstad continues to funnel cash from Folding Light through the Corporate Defendants [and] into his own pockets to feed his lavish lifestyle and maintain his image with private equity investors so he can continue obtaining a steady supply of trading capital." [51] at 8.

When it comes to the corporate defendants, on the other hand, the amended complaint continues to recite the elements of the operation-or-management requirement in a conclusory fashion. Each corporate defendant "directed and participated, directly and indirectly, in the illegal activities of the Enterprise, including fraudulently obtaining funds from the Trust, as well as other investors." [42] ¶¶ 89, 95, 98, 101, 104; *see also id*. ¶¶ 81, 108. And each corporate defendant "participated in facilitating and paying illegitimate business expenses in furtherance of the Enterprise through the electronic transfer of funds to each other or directly to American Express." *Id*. ¶¶ 87, 93, 96, 99, 102, 106, 111. The complaint does not allege that the American Express payments, even if made for illegitimate business expenses, amount to racketeering activity or proximately caused plaintiffs' injuries. *See Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 17–18 (2010) (RICO's "reach is limited by the 'requirement of a direct causal connection' between the predicate wrong and the harm") (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006))). But even setting those issues aside, plaintiffs' conclusory allegations—bereft of any facts that would give rise to a reasonable inference of wrongdoing—"will not do." *See Patel*, 986 F.3d at 700. "Absent particular allegations"

14

that the corporate defendants "participated in the operation or management" of the enterprise, none can be held liable under § 1962(c). *Id.*

The complaint's most specific allegations against the corporate defendants are: that Flagstad transferred $340,000 to FFA from Folding Light and that Oxford Marketing remains on the hook to Folding Light for most of the $200,000 loan (which Flagstad procured). [42] ¶¶ 20–21. But there is nothing to suggest that either FFA or Oxford Marketing were anything more than Flagstad's pass-through vehicles to transfer funds to himself. The same goes for the allegations that Flagstad signed fraudulent loan-application documents on behalf of Oxford Marketing and Oxford Tax. Allegations of defrauding the government and financial institutions are serious, but again, plaintiffs have not shown how this conduct is related to their injury or how Oxford Marketing or Oxford Tax were managing or operating an enterprise. As for the remaining corporate defendants, the complaint contains no specific factual allegations of any conduct by Oxford Media, Oxford FG, Oxford GP, or Cloverpoint.[2]

In the end, plaintiffs' amended complaint gets no closer to satisfying the operation-or-management requirement. So, even if plaintiffs had sufficiently alleged an enterprise, their RICO claim would fall short against all corporate defendants. *See*

---

[2] Plaintiffs allege, "upon information and belief," that Flagstad and Cloverpoint engaged in offshore banking "to secrete fraudulently obtained funds from the Trust." [42] ¶¶ 79, 110. Plaintiffs appear to base this allegation on the fact that Flagstad "obtained letters of reference from a bank officer at a federally insured institution and an attorney in order to establish offshore bank accounts." *Id.* ¶ 79. But there is no allegation of RICO predicate acts stemming from this conduct. And even if Flagstad took steps to establish an offshore bank account to further a fraud scheme, there are no factual allegations that raise a reasonable inference that Cloverpoint had any involvement, let alone managed or operated an enterprise.

15

*Patel*, 986 F.3d at 699 (RICO "does not penalize tangential involvement in an enterprise") (quoting *Crichton*, 576 F.3d at 399)).

### 3.  *Pattern of Racketeering Activity*

A "pattern of racketeering activity" requires "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). RICO predicate offenses include mail, wire, and bank fraud (18 U.S.C. §§ 1341, 1343, 1344), and the interstate transportation of stolen property (18 U.S.C. § 2314). *See* 18 U.S.C. § 1961(1)(B).[3] The pattern pleading requirement is "designed 'to forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law.'" *Menzies*, 943 F.3d at 337 (quoting *Midwest Grinding*, 976 F.2d at 1022).

To establish a pattern of racketeering activity, a plaintiff must show a "continuity plus relationship," meaning "a relationship between the predicate acts as well as a threat of continuing activity." *Menzies*, 943 F.3d at 337 (quoting *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011)). The relationship element "is satisfied by acts of criminal conduct close in time and character, undertaken for similar purposes, or involving the same or similar victims, participants, or means of commission." *Menzies*, 943 F.3d at 337. A plaintiff can establish continuity either by "(1) demonstrating a close-ended series of conduct that existed for such an extended period of time that a threat of future harm is implicit, or (2) an open-ended series of

---

[3] Plaintiffs also allege that Flagstad, Oxford Marketing, and Oxford Tax violated 18 U.S.C. § 1001 and 18 U.S.C. § 1014 by making false statements on the PPP loan applications. *See* [42] ¶ 121. But these are not predicate acts under RICO.

conduct that, while short-lived, shows clear signs of threatening to continue into the future." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cty., Illinois*, 424 F.3d 659, 673 (7th Cir. 2005).

Here, plaintiffs assert an open-ended pattern of continuity. [42] ¶ 32. To determine whether such a pattern exists, courts focus "not on what acts occurred in the past but on whether a concrete threat remains for the conduct to continue moving forward." *Menzies* 943 F.3d at 337. A plaintiff may establish open-ended continuity by showing that "a defendant's actions pose a specific threat of repetition; that the predicate acts form part of the defendant's ongoing and regular way of doing business; or that the defendant operates a long-term association for criminal purposes." *Id*. Moreover, when alleging predicate acts of fraud, "Rule 9(b) requires a plaintiff to provide 'precision and some measure of substantiation' to each fraud allegation." *Id*. at 338 (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)). Rule 9(b) applies when a RICO plaintiff alleges predicate acts of mail fraud, wire fraud, and interstate transportation of stolen property (when the funds at issue are alleged to have been procured by fraud). *See Menzies*, 943 F.3d at 338; *Perlman v. Zell*, 938 F.Supp. 1327, 1349 (N.D. Ill. 1996).

Plaintiffs say that the amended complaint includes specific allegations against each defendant, that financial records show specific dates and amounts of fraudulent wire transfers, and that this fraudulent conduct is open-ended and constitutes defendants' regular way of conducting business. Plaintiffs argue that defendants "engaged in unauthorized electronic transfers of Trust funds dozens of times over a

three-year period" and that "[a]side from the U.S. Government, there were likely numerous other 'investor' victims, some of whom have already filed suit in federal court." [51] at 16.

As with the original complaint, the amended complaint adequately alleges only that Flagstad committed predicate acts. Plaintiffs claim that in May 2018, Flagstad falsely told Streibich that the Trust's investment in Folding Light would be used for trading purposes only. [42] ¶¶ 17–19. Plaintiffs allege that despite Flagstad's repeated assurances, he began transferring funds from Folding Light to himself and FFA just weeks after securing the Trust's investment. *Id.* ¶¶ 20–21. The complaint provides partial banking records—from mid-2019 to early 2020—showing over $849,000 in unauthorized transfers that Flagstad made, from Folding Light, into two accounts. *Id.* ¶¶ 28–29. These allegations are sufficiently specific at the pleading stage—even under Rule 9(b)'s heightened requirements—to allege that Flagstad used interstate wire transfers to further a scheme to defraud plaintiffs and to transport stolen property.

But plaintiffs still have not sufficiently alleged the corporate defendants' liability for a predicate act. A RICO plaintiff alleging predicate acts of fraud must "plead sufficient facts to notify *each defendant* of his alleged participation" in the fraudulent scheme. *Goren*, 156 F.3d at 726 (emphasis added); *see also Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 77–78 (7th Cir. 1994). With respect to the corporate defendants here, the plaintiffs allege that the "mails and wires were used on numerous occasions in furtherance of" defendants' scheme and that

defendants communicated with one another and financial institutions through the use of "electronic mail and/or telephone" and "internet banking platforms" to fraudulently apply for and obtain bank loans, execute cash transfers, and create fraudulent loans between defendants. [42] ¶¶ 122–124; *see also id*. ¶ 119.

When RICO claims are based on predicate acts of mail and wire fraud, however, a plaintiff must "do more than allege fraud generally" and courts "do not look favorably on many instances of mail and wire fraud to form a pattern." *Menzies*, 943 F.3d at 338 (quoting *Midwest Grinding*, 976 F.2d at 1025); *see also Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 475 (7th Cir. 2007) ("We have repeatedly rejected RICO claims that rely so heavily on mail and wire fraud allegations to establish a pattern."). And that is what we have here. Plaintiffs conclusory allegations of mail and wire fraud "fail to specify the time, place and content" of any misrepresentations or action by the corporate defendants and "therefore fall short of the particularity demanded by Rule 9(b)." *Goren*, 156 F.3d at 730. Plaintiffs cannot simply treat "all the defendants as one; such 'lumping together' of defendants is clearly insufficient to state a RICO claim under § 1962(c)." *Id*. In the absence of particular facts to put each corporate defendant on notice for its alleged involvement in the predicate acts, plaintiffs' allegations are insufficient to satisfy Rule 9(b)'s requirements.

Further, the amended complaint once again fails to plausibly allege an open-ended pattern of continuity. Plaintiffs have not shown a threat of repetition or that the scheme alleged here was defendants' ordinary way of doing business. Plaintiffs

19

argue that defendants' fraudulent conduct—obtaining funds through the guise of legitimate companies and diverting those funds to advance defendants' and the enterprise's interests—is open-ended and constitutes their regular way of doing business. [51] at 16; [42] ¶ 32. But a plaintiff's "conclusory allegations that 'defendants' also defrauded unidentified 'others' are not enough to plead the requisite pattern of fraud." *Goren*, 156 F.3d at 729. And that is all the amended complaint says about other investors.

Plaintiffs have likewise not pleaded how the corporate defendants' payment of Flagstad's illegitimate business expenses were tied to predicate acts of racketeering. Moreover, the allegations that Flagstad, Oxford Marketing, and Oxford Tax defrauded Wintrust and the government do not plausibly suggest a specific continuing pattern of racketeering activity based on related conduct. *Rao*, 589 F.3d at 400 (plaintiff must "set forth a pattern of related acts in connection with an enterprise's conduct"). The false statements that plaintiffs identify are not RICO predicate acts, and the alleged bank fraud to secure PPP loans does not create a pattern. Although similar in the sense that the crimes were for Flagstad's benefit, the new allegations are not similar to the defalcation or embezzlement of the Trust's investment and involve a different kind of victim. They are not part of the same pattern. And the amended complaint's failure to adequately allege that any corporate defendant committed another predicate act further shows the absence of a pattern. Failure to allege a pattern of racketeering activity provides a third independent ground for dismissal of the RICO claim.

One final note on plaintiffs' substantive RICO claims. A common theme of plaintiffs' brief is that they need more discovery because defendants exclusively possess the details needed to state a RICO claim. [51] at 6, 9–10. Generally, Rule 9(b) is satisfied "by a showing that further particulars of the alleged fraud could not have been obtained without discovery." *Emery*, 134 F.3d at 1323. To make such a showing, a RICO plaintiff must demonstrate that "(1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1108 (7th Cir. 2014) (quoting *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011)). Plaintiffs allege that Flagstad wholly controls Folding Light's financial information and that information relating to additional victims of defendants' conduct is exclusively within the defendants' control. [42] ¶¶ 27, 76, 123–124.

Plaintiffs had the opportunity to engage in limited discovery to trace financial transactions after dismissal of the original complaint, yet they still cannot plead facts that establish the corporate defendants' involvement in the predicate acts. Further, plaintiffs' assertions do not establish an inability to access the details necessary to state a claim. There is no reason to think that defendants somehow exclusively control access to other investors who might have been injured by defendants' conduct. Nor have plaintiffs shown plausible grounds to suspect that the corporate defendants played a culpable role in the alleged mail and wire fraud. *See Pirelli*, 631 F.3d at 443 ("The grounds for the plaintiff's suspicions must make the allegations *plausible*, even

as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail.").

The RICO claim is dismissed.

## B.   RICO Conspiracy

RICO makes it unlawful to conspire to violate any of the substantive provisions of the statute (subsections (a), (b), or (c)). *See* 18 U.S.C. § 1962(d). To state a claim for RICO conspiracy, a plaintiff must show that: "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *DeGuelle*, 664 F.3d at 204 (quoting *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001)). Plaintiffs argue that they have sufficiently pleaded an enterprise and that the amended complaint contains facts that raise a reasonable inference that defendants had an agreement to participate in the enterprise.

Plaintiffs' failure to sufficiently allege that defendants "conducted the affairs of an enterprise is also fatal to [the] RICO conspiracy claim." *United Food & Commercial*, 719 F.3d at 856. In other words, plaintiffs have not alleged the existence of "an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive [RICO] statute." *Goren*, 156 F.3d at 732. Nor does the amended complaint raise a reasonable inference of an agreement between defendants. Plaintiffs have not alleged that defendants "with knowledge of a conspiracy to violate the RICO statute, agreed to conduct or participate in the affairs

22

of an enterprise through a pattern of racketeering and agreed to the commission of two predicate acts of racketeering." *Patel*, 986 F.3d at 699. That is, neither the corporate defendants' use as pass-through vehicles, nor the conclusory allegation that each defendant communicated with one another, plausibly suggest that any defendant entered a conspiracy. The central allegation remains that Flagstad defrauded the Trust. There is no allegation that some meeting of the minds occurred to create an enterprise and engage in a pattern of racketeering to achieve Flagstad's goals.

The RICO conspiracy claim is dismissed.

### C.   State Law Claims

The presumption is that when "the federal claims drop out before trial, the district court should relinquish jurisdiction over the state-law claims." *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007); *see also* 28 U.S.C. § 1367(c)(3); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). There is no federal interest in the remaining state-law dispute, so the remaining claims are dismissed without prejudice.

### D.   Leave to Amend

Plaintiffs request leave to amend the complaint a second time. [51] at 18–20. Under Federal Rule of Civil Procedure 15(a)(2), a court should freely give leave to amend when justice so requires. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015). But the rule does "not mandate that leave be granted in every case." *Park v. City of Chicago*, 297 F.3d 606, 612 (7th

Cir. 2002). I have discretion to deny leave after "repeated failure to cure deficiencies" or when "amendment would be futile." *Huon v. Denton*, 841 F.3d 733, 745 (7th Cir. 2016) (quoting *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008)).

The amended RICO claim suffers from the same deficiencies as the first. It identifies no enterprise, operation or management, pattern, or conspiracy, and thus fails to allege plausible RICO claims against any of the defendants. Plaintiffs' second attempt to state a claim repeats the principal allegations of the first and gets no closer to identifying an enterprise. Although plaintiffs have added new allegations, these new facts do not move plaintiffs' RICO claims across the plausibility threshold. As such, further amendment would be futile and the RICO claims are dismissed with prejudice.

One issue remains. After defendants filed the present motion to dismiss, plaintiffs sought leave to file a second amended complaint to add a new plaintiff—Channel Holdings, LLC—and a new claim against Flagstad under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. [49]. Because the proposed complaint did not address the arguments raised in the motion to dismiss, I denied the motion without prejudice. [50]. "A new claim is futile if it would not withstand a motion to dismiss." *Divane v. Northwestern University*, 953 F.3d 980, 993 (7th Cir. 2020) (quoting *Vargas-Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 974 (7th Cir. 2001)). The proposed CFAA claim asserts that Flagstad exceeded his authority on Channel Clarity and Folding Light's computers to access confidential financial information, which he used to steal company assets. *See* [49-1] ¶¶ 114–123. The court

24

would benefit from briefing on the viability of the proposed amendment. Plaintiffs may renew their motion for leave to file a second amended complaint, now without any RICO claim, to add Channel Clarity and the CFAA claim against Flagstad.

## IV.    Conclusion

Defendants' motion to dismiss, [44], is granted. The RICO claims are dismissed with prejudice; the state-law claims are dismissed without prejudice. Plaintiffs may move for leave to file a second amended complaint to add Channel Clarity, LLC as a plaintiff and to add the proposed Computer Fraud and Abuse Act claim against Flagstad by May 4, 2021. If no motion is filed, the clerk will enter a final judgment dismissing the RICO claims with prejudice and the state-law claims without prejudice and terminating this case. The court will set a briefing schedule on any motion to file an amended complaint after the motion is docketed. The motion to withdraw as attorney, [58], is granted. The clerk shall terminate Matthew J. Schmidt's appearance on behalf of the defendants.

ENTER:

Manish S. Shah
United States District Judge

Date:  April 20, 2021

25