# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE JAMES STREIBICH REVOCABLE TRUST OF 2002, an Illinois Trust, individually, and derivatively, on behalf of FOLDING LIGHT, LLC, a Delaware Limited Liability Company, and CHANNEL CLARITY HOLDINGS, LLC, a Delaware Limited Liability Company, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 20-cv-2242 |
| BROCK H. FLAGSTAD, an individual; OXFORD MARKETING PARTNERS, LLC, a Delaware Limited Liability Company; OXFORD MEDIA, LLC, an Illinois Limited Liability Company; OXFORD TAX PARTNERS, LLC, an Illinois Limited Liability Company; OXFORD FG, LLC, an Illinois Limited Liability Company; OXFORD GP, LLC, an Illinois Limited Liability Company; FINANCIAL FREEDOM ADVISORS, LLC, an Illinois Limited Liability Company; and CLOVERPOINT PARTNERS, LLC, an Illinois Limited Liability Company; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Honorable Judge Manish S. Shah |
| Defendants. | ) ) | |

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES,
AND APPOINTMENT OF A RECEIVER**

Plaintiff, THE JAMES STREIBICH REVOCABLE TRUST OF 2002, an Illinois Trust,

individually ("the Trust"), and derivatively, on behalf of FOLDING LIGHT, LLC, a Delaware

Limited Liability Company ("Folding Light") and CHANNEL CLARITY HOLDINGS, LLC, a

Delaware Limited Liability Company ("Channel Clarity") (hereinafter collectively the

"Plaintiffs"), by its attorneys, Sheppard, Mullin, Richter & Hampton, LLP, for its Second

Amended Complaint for Injunctive Relief, Damages and Appointment of a Receiver, against the

Defendants BROCK H. FLAGSTAD ("Flagstad"), OXFORD MARKETING PARTNERS, LLC

("Oxford Marketing"), OXFORD MEDIA, LLC ("Oxford Media"), OXFORD TAX

PARTNERS, LLC ("Oxford Tax"), OXFORD FG, LLC ("Oxford FG"), OXFORD GP, LLC

("Oxford GP") (hereinafter collectively referred to herein as "Oxford"), FINANCIAL FREEDOM ADVISORS, LLC ("FFA"); and CLOVERPOINT PARTNERS, LLC ("Cloverpoint") (collectively, "the Defendants"), allege as follows:

## NATURE OF THE CASE

1.      This action arises out of a scheme to defraud the Trust of over $2,000,000 by inducing the Trust to invest in Folding Light to provide it with trading capital for crypto currency and securities trading.  In order to secure the monies from the Trust, Flagstad falsely represented that an investment from the Trust would be used as trading capital for Folding Light's E-mini futures, U.S. Treasury and crypto currency trades.  Flagstad represented engaging in "live" trading was critical to Folding Light's ability to demonstrate that its proprietary trading platform was viable and would generate actual returns.  Without active trading, Folding Light would not be able to attract significant additional outside capital to build the business.  However, with active trading, Flagstad represented it would be able to attain significant growth and returns.  The Trust, based upon Flagstad's representations, invested $2,000,000 into Folding Light.  The Defendants, at Flagstad's direction, however, ended up transferring trading capital the Trust invested with Folding Light to the Defendants' bank accounts.  Flagstad further induced the Trust to invest over $200,000 into Channel Clarity.  Flagstad represented the Trust's investment was to be used for business expansion and working capital.  Instead, Trust funds were stolen and used to benefit the Defendants'.  The Trust brings this action individually, and derivatively on behalf of Folding Light and Channel Clarity, both of whom have been irreparably damaged as a result of the Defendants' unlawful conduct for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. Sections 1030(a)(2)(c) and (a)(4) (Count I); Common Law Fraud (Count II), Conversion/Theft (Count III), Breach of Fiduciary Duty (Count IV), Breach of Contract (Count V),  Civil Conspiracy (VI), and for an Accounting (VII).

## PARTIES

2.     Plaintiff, The James Streibich Revocable Trust of 2002 ("the Trust"), is an Illinois Trust, with its principal office located in Chicago, Illinois.  The Trust maintains a membership interest in Folding Light and Channel Clarity.

3.     Plaintiff Folding Light, LLC, ("Folding Light") is a Delaware Limited Liability Company, with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.

4.     Plaintiff Channel Clarity Holdings, LLC ("Channel Clarity") is a Delaware Limited Liability Company, with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.

5.     Defendant Brock Flagstad ("Flagstad") is an individual domiciled in Sea Island, Georgia.  Flagstad maintains a membership in Folding Light and acts as its Lead Manager. Flagstad moreover maintains an interest in Channel Clarity and holds himself out as its Chief Executive Officer.

6.     Defendant Oxford Marketing Partners, LLC ("Oxford Marketing") is a limited liability company organized under the laws of the state of Delaware with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Oxford Marketing Partners, LLC.

7.     Oxford Media Group, LLC ("Oxford Media") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street.  Flagstad is a member of and controls Oxford Media, LLC.

8.     Oxford Tax Partners, LLC ("Oxford Tax") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in

Chicago, Illinois at 215 W. Ohio Street. Flagstad is a member of and controls Oxford Tax Partners, LLC.

9. Oxford FG, LLC ("Oxford FG") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street. Flagstad is a member of and controls Oxford FG, LLC.

10. Oxford GP, LLC ("Oxford GP") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street. Flagstad is a member of and controls Oxford GP, LLC.

11. Financial Freedom Advisors, LLC ("FFA") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street. Flagstad is a member of and controls Financial Freedom Advisors, LLC.

12. Cloverpoint Partners, LLC ("Cloverpoint") is a limited liability company organized under the laws of the state of Illinois with its principal place of business located in Chicago, Illinois at 215 W. Ohio Street. Flagstad is a member of and controls Cloverpoint Partners, LLC.

## JURISDICTION AND VENUE

13. Original jurisdiction over this matter exists pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1030, *et seq*. The Court also has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367.

14. Venue of this action is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

15. Flagstad has started numerous limited liability companies ("Flagstad Companies") in Chicago – most, if not all, of which are located at the same address of 215 West Ohio Street. Flagstad Companies also share the same accountant and law firm for advisory services.

16. Flagstad has solicited millions of dollars in private equity funds for Flagstad Companies from numerous prominent Chicago-area investors. Flagstad's common business model is to start a company that purportedly develops a revenue stream through the collection and/or sale of data. Flagstad Companies include a variety of industry sectors, including, marketing/advertising, healthcare, and tax. Once formed, Flagstad then seeks out millions of dollars in investment capital with the promise of rapid growth and above market returns to investors. Flagstad's Companies all take the form of either Delaware or Illinois limited liability companies.

17. On or about May 2018, Flagstad approached the Trust through its Trustee James Streibich ("Streibich") to solicit an investment in Folding Light. Flagstad represented that Folding Light had developed a proprietary financial trading platform to trade securities and bitcoin and other crypto-based currencies. Flagstad represented that Folding Light's proprietary trading platform for block chain currency trading was unique in the Financial Technology industry. He further represented to the Trust that Folding Light was looking for trading capital in order to activate its trading strategies. With trading capital, it could validate its business model and build Folding Light into a significant market participant. Flagstad represented that trading platform "back testing" had demonstrated significant financial returns. And, with the trading capital from the Trust, Folding Light could demonstrate actual returns which would allow it to: 1) attract significant additional outside private equity investment, and 2) be able to leverage the trading capital at multiple times its value.

18.     Flagstad represented and warranted to the Trust that, in exchange for an investment of $2,000,000 to be used for trading capital, the Trust would acquire a preferred interest in Folding Light.  Flagstad further represented and warranted that the Trust funds received would be used only for Folding Light trading capital.  Flagstad confirmed this during a January 29, 2020 conference call with Streibich and attorney Stan Sneeringer.  Flagstad and Sneeringer during the conference call explained that a promissory note would be established between the Trust and Folding Light.

19.     Streibich told Flagstad that the Trust was interested in investing in Folding Light to provide trading capital in response to Flagstad's representations.  Flagstad reaffirmed his promise that the Trust's funds would only be used for trading capital – not to fund Folding Light business expenses – and that business expenses were the responsibility of Flagstad and Folding Light Member, Kasey Klaas.  In May 2018, the Trust, in reliance upon Flagstad's representations and warranties, invested $2,000,000 into Folding Light.  In exchange, the Trust received a membership interest in the form of preferred capital in Folding Light.

20.     Only a matter of weeks after the Trust's investment, Folding Light, at Flagstad's direction and control, began electronically transferring money from Folding Light's bank account to Flagstad and Defendant FFA.  Between June 1 and July 24, 2018, $340,000 of Folding Light cash was transferred to Flagstad and FFA.  In the Fall of 2018, the Folding Light trading team and other members departed to start a competing trading company.  Folding Light thereafter filed suit against former Folding Light Members and employees alleging, inter alia, claims under the Computer Fraud and Abuse Act for misuse of Folding Light computers.  *See* Folding Light, LLC v. Kasey Klaas, et al., Case No. 1:19-cv-03949 (N.D. Ill. filed June 12, 2019).  The Defendants responded with counterclaims against Flagstad for conversion and

breach of fiduciary duty to Folding Light. The counterclaims allege that Flagstad through unlawful bank transfers from Folding Light accounts converted over $340,000 from Folding Light and electronically transferred the funds to Flagstad Company FFA.

21.     Upon learning of the counterclaim against Flagstad, the Trust inquired of the claim. Flagstad denied converting funds and represented that the counter claimants did not understand accounting. With financial trading on hold due to the abrupt departure of Folding Light's trading team and funds in Folding's Light's account, Flagstad approached Streibich regarding establishing a Revolving Credit Line of $200,000 between Folding Light and Defendant Oxford Marketing. Streibich agreed to this loan to Oxford Marketing as long as Oxford Marketing made interest payments on a monthly basis to Folding Light. Oxford Marketing made the first four interest payments and then stopped.

22.     In the summer of 2019, Flagstad moved his residence from Chicago to Sea Island, Georgia. Defendants have made cash payments for Flagstad's living and home expenses in Sea Island, Georgia. Folding Light was no longer operational and remained embroiled in a dispute with its former trading team and Folding Light Members. With Flagstad's move to Georgia, the Trust was finding it difficult to receive information from him regarding Folding Light's finances. Flagstad became increasingly unavailable to discuss Folding Light and repeatedly ignored the Trust's requests for updated Company reports regarding its financial affairs.

23.     Flagstad has a rapacious personal need for cash to support his lavish lifestyle of private jets and expensive cars. His cash needs exceeded any compensation he received from Folding Light or Channel Clarity. As a result, he engaged in fraud in order to steal at least $1.5 million in cash between January 2019 and August 2020 from the Plaintiffs.

24.     Defendants have further created phony invoices and/or expense records to substantiate the hundreds of thousands of dollars transferred from Channel Clarity and Folding Light to Oxford Media, FFA, and the other Defendants. Flagstad and the Defendants have further deleted, altered, or permanently destroyed Channel Clarity and Folding Light confidential financial data on company computers to cover up the financial fraud alleged herein.

25.     In late 2019, the Trust persisted in seeking financial information regarding Folding Light, without success.  With Flagstad's failures to communicate to the Trust, its concern and suspicion increased.  As a result, in February 2020 Streibich decided to go directly to one bank where he knew Folding Light maintained an account.  He was able to obtain partial banking information that startingly revealed that Flagstad—beginning as early as January 2019 and without notifying Folding Light Members, notifying the management committee, providing collateral, or requesting the Trust's consent for a related party transaction as was done just one month prior for the Revolving Line of Credit Line—directed at least $849,000 in unauthorized secret cash wire transfers out of Folding Light to his personal bank accounts or to accounts of the other Defendants.

26.     The partial bank records that were recovered reveal Flagstad's illegal cash wire transfers from Folding Light in the following stunning amounts:

| Date | Account | Amount ($) |
|---|---|---|
| 06-04-19 | 4494 | 50,000 |
| 06-05-19 | 4494 | 25,000 |
| 06-14-19 | 4494 | 125,000 |
| 06-24-19 | 4494 | 100,000 |
| 07-01-19 | 4494 | 100,000 |
| 08-15-19 | 4494 | 44,269 |
| 08-27-19 | 1146 | 50,000 |
| 09-17-19 | 4494 | 100,000 |
| 10-21-19 | 4494 | 25,000 |
| 11-13-19 | 1146 | 16,332 |

| | | |
|---|---|---|
| 11-18-19 | 4494 | 25,000 |
| 11-20-19 | 4494 | 15,000 |
| 12-02-19 | 4494 | 25,000 |
| 12-10-19 | 4494 | 15,000 |
| 12-16-19 | 4494 | 40,000 |
| 12-19-19 | 4494 | 7,500 |
| 01-09-20 | 4494 | 50,000 |
| 01-16-20 | 4494 | 21,000 |
| 02-07-20 | 4494 | 15,000 |
| | | $849,100.73 |

27.     Additionally, beginning at least as of January of 2019, and until at least August of 2020, the Oxford Defendants have paid $5,290,780.72 to American Express for charges Flagstad incurred.  Channel Clarity paid a stunning $625,762.87 to American Express for Flagstad credit card charges and cash transfers.  These expenses, in whole or in part, are not legitimate business expenses.  Flagstad unlawfully and without authority accessed Channel Clarity computers and financial accounts  to make the illegal Channel Clarity fund transfers.  These payments were not made with the knowledge, consent, or approval of the Channel Clarity Board or its other members including the Trust.  Flagstad has altered, deleted,  or permanently destroyed Channel Clarity and Folding Light confidential financial data on its computers to cover up the unlawful conduct alleged herein. Flagstad had no authority to access Channel Clarity financial accounts through its computers to make these fraudulent transfers or to alter, delete or destroy confidential financial data. The Plaintiffs learned of this illegal conduct and the cash transfers from Channel Clarity only through its own investigation including through documents obtained directly from American Express.

28.     The Trust also invested over $200,000 into Channel Clarity in response and in reliance upon false representations Flagstad made.  Flagstad falsely represented that the Trust's investment would be used to capitalize Channel Clarity for working capital and business

expansion. Instead, the Trust learned in October of 2020, that Flagstad lied to the Trust and took the Trust investment funds for his own personal use and benefit. The Trust has been defrauded and is continuing to be defrauded through the unlawful acts as alleged herein, including but not limited to, Flagstad's theft of $625,762.87 in cash to pay illegitimate American Express credit card charges, unauthorized and illegal cash transfers from Channel Clarity totaling at least $69,967.22 both conducted through the unauthorized access of Channel Clarity computers and confidential financial accounts maintained on its company computers.

29.     In order to obtain a Paycheck Protection Program ("PPP") PPP loan, a business must submit a PPP loan application (SBA Form 2483), which is signed by an authorized business representative.   The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and to make certain affirmative certifications regarding its eligibility.  In the application, the small business's authorized representative must also provide, among other things, the business's: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the business's eligibility and the amount of money it may receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

30.     On April 4, 2020, Oxford Marketing submitted a Borrower Application Form ("Application") for a $292,650 PPP loan to Wintrust Financial ("Wintrust").  Flagstad without authorization accessed and used a Channel Clarity computer and its e-mail accounts to submit the Application.  He further unlawfully and without authorization communicated with Wintrust through a Channel Clarity computer and e-mail account to prepare and submit the Application.

31.     The Oxford Marketing Application represented that it had 56 employees and an average monthly payroll of $117,060.  The Oxford Marketing Application represented that the

purpose of the loan was for payroll. The Application identified Flagstad as a 50% owner in Oxford Marketing. The other 50% owner in Oxford Marketing is an individual.

32.     The primary contact in the Application was identified as Flagstad who could be contacted at Channel Clarity by telephone and through his Channel Clarity e-mail account of bflagstad@channelclarity.com.

33.     On April 17, 2020, a deposit in the amount of $292,650 with the description "Loan Proceeds SBA PPP" was made in Oxford Marketing's Wintrust account ending in 4494.

34.     Oxford Marketing in April 2020 did not have 56 employees and it does not today. In fact, at the time of the loan application, and receipt of SBA funds from Wintrust, Oxford Marketing had less than fifteen employees. Oxford Marketing fraudulently obtained $292,650 in SBA loan proceeds from Wintrust through the unlawful use of Channel Clarity computers and e-mail account.

35.     On April 4, 2020, Oxford Tax submitted a Borrower Application Form ("Application") for a $350,755 PPP loan to Wintrust. Flagstad without authorization used a Channel Clarity computer and e-mail account to submit the Application. He unlawfully further communicated with Wintrust through a Channel Clarity computer and e-mail account to prepare and submit the Application.

36.     The Oxford Tax Application represented that it had 50 employees and an average monthly payroll of $140,302. The Oxford Tax Application represented that the purpose of the loan was for payroll.

37.     The primary contact in the Application was identified as Flagstad who could be contacted at Channel Clarity by telephone and through his Channel Clarity e-mail account of bflagstad@channelclarity.com.

38.     In or around April 2020, a deposit in the amount of $350,755 with the description "Loan Proceeds SBA PPP" was made in Oxford Tax's Wintrust account.

39.     In April 2020, Oxford Tax did not have 50 employees and does not today.  In fact, at the time of the loan application, and receipt of SBA funds from Wintrust, Oxford Tax had less than fifteen employees.

40.     It was the purpose of Oxford Tax in submitting a fraudulent PPP loan application to Wintrust, where it represented that Oxford Tax was a fully functional business with 50 employees, and that the SBA loan proceeds were to be used for payroll, to obtain monies in furtherance of the Defendants ongoing fraud.

41.     Oxford Tax fraudulently obtained $350,755 in SBA loan proceeds from Wintrust to enrich Flagstad.

42.      Flagstad breached his fiduciary duty to Channel Clarity and Folding Light and the Trust when he directed the transfer of assets from Channel Clarity and Folding Light to himself and the other Defendants. He furthermore, over the last two years has paid over $5 million dollars in illegitimate American Express bills with cash proceeds taken from Channel Clarity and Folding Light.


**COUNT I**
**(Violation of the Computer Fraud and Abuse Act)**
**(18 U.S.C. § 1030)**
**(Flagstad)**

43.     Plaintiffs reallege paragraphs 1 through 42 as though fully set forth herein.

44.     The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (the "CFAA") in relevant part provides that it is unlawful for a person to "(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains – information from any protected

computer" and who "knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." 18 U.S.C. § 1030(a)(2)(C), 18 U.S.C. § 1030(a)(4).

45.     A protected computer under the CFAA is a computer that ". . . . is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States; "18 U.S.C. § 1030(e)(2)(B).

46.     The CFAA further provides that "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030 (e)(2)(B).

47.     Folding Light and Channel Clarity computers were at all relevant times "protected computers" used in conjunction with their respective businesses' platforms and activity to conduct transactions across state lines and provided access to worldwide communications through applications accessible through the internet. Thus, Folding Light and Channel Clarity computers were at all relevant times used in or affecting interstate or foreign commerce or communications and are protected computers pursuant to the CFAA, 18 U.S.C. § 1030(e)(2)(B).

48.     Flagstad without authorization or exceeded his authority when he accessed and utilized Channel Clarity and Folding Light computers to improperly obtain confidential financial data belonging to Channel Clarity and Folding Light, including but not limited to, its statements of accounts, balance sheets, financial statements, cash report journals, account receivable and

account payable information, customer account information and banking account pass codes ("confidential financial data") and engaged in at least the following unlawful conduct which the Plaintiffs are aware of at this early stage in this proceeding: the outright theft of Channel Clarity and Folding Light assets, including cash; unlawful electronic transactions with banks and financial institutions; and fraudulently applied for and obtained PPP funds on behalf of Oxford Marketing and Oxford Tax through the use of Channel Clarity computers and e-mail accounts.

49.     Furthermore, Flagstad without authorization or exceeded his authority when he accessed and utilized Channel Clarity and Folding Light computers to improperly alter, delete, and destroy confidential financial data belonging to Channel Clarity and Folding Light, to cover up his continuing fraudulent financial scheme, including but not limited to, altering and deleting statements of accounts, balance sheets, financial statements, cash report journals, account receivable and payable information, customer account information, invoices received from third parties, and banking account pass codes. Flagstad's unlawful conduct has permanently impaired both Channel Clarity and Folding Light's financial data.

50.     Flagstad was not authorized to access Channel Clarity and Folding Light computers to use Channel Clarity and Folding Light confidential financial data, to steal Channel Clarity and Folding Light assets including cash, and to then engage in unlawful electronic transactions with federally insured banks and financial institutions.  He was further not authorized to use Channel Clarity computers and e-mail accounts to falsely apply for and obtain PPP loans on behalf of Oxford Marketing and Oxford Tax, for his and the Defendants personal benefit, and to the detriment of the Trust, Channel Clarity, and Folding Light. Nor was he authorized to alter and/or delete Channel Clarity and Folding Light financial data on their computers.

51.     Flagstad exceeded his authorized access and/or was not authorized to use Channel Clarity and Folding Light computers for the conduct alleged herein.

52.     Flagstad, by intentionally, knowingly, and with intent to defraud the Plaintiffs accessed Folding Light and Channel Clarity computers without authorization or exceeded his authorization to access company computers and has caused the Plaintiffs to incur financial losses for responding to Flagstad's illegal conduct and computer fraud with expenditures for forensic computer services and investigative work of at least five thousand dollars ($5,000.00) during a one year period pursuant to 18 U.S.C. § 1030(c)(4)(A)(i)(I), and the losses are continuing.

53.     Flagstad's unlawful access and theft of Channel Clarity and Folding Light confidential financial data, assets and cash has caused and is causing irreparable harm to the Trust, Folding Light and Channel Clarity for which it has no adequate remedy at law.  Unless the Court restrains Flagstad and all those in privity, concert or participation with him from engaging in the acts and practices in violation of 18 U.S.C. § 1030 *et seq*., pursuant to 18 U.S.C. § 1030(g), Flagstad's behavior will persist.

WHEREFORE, the Plaintiffs pray for the following relief against Flagstad:

a.      Award the Plaintiffs damages in an amount in excess of $2,200,000;

b.      Injunctive relief restraining and enjoining Flagstad or anyone acting in concert with him from engaging in practices in further violation of the CFAA;

c.      Award costs of litigation including; but not limited to, attorneys' fees, court costs and expert costs;

d.      Award prejudgment interest on any monetary awards to the Plaintiffs; and

e.      For such other and further relief the court deems is just.

## THE PENDENT STATE LAW CLAIMS

### COUNT II
### (Common Law Fraud)
### (Flagstad)

54.     Plaintiffs reallege paragraphs 1 through 42 as though fully set forth herein.

55.     Folding Light received from the Trust $2,000,000 in funds intended for use as trading capital and not to be used for business operating expenses. Channel Clarity received from the Trust $200,000 in funds intended for use as operating capital and to expand the business. Flagstad instead unlawfully took Channel Clarity and Folding Light funds received from the Trust for himself and the Defendants.

56.     At the time that Flagstad represented to the Trust that its investment would be used for Folding Light trading capital, Flagstad was fraudulently soliciting funds from the Trust so he could obtain them for himself and the other Defendants. Once the Trust funds were received at Folding Light, Flagstad unlawfully accessed Folding Light financial accounts and directed Folding Light's bank, Wintrust, to transfer funds to himself and the other Defendants.

57.     At the time that Flagstad represented to the Trust that its investment would be used for operating capital and to expand Channel Clarity's business, Flagstad was fraudulently soliciting funds from the Trust so he could obtain them for himself and the other Defendants.

58.     At the time that Flagstad made the representations to the Trust, he knew that his representations were false.

59.     Flagstad made the representations to the Trust with the intent to fraudulently obtain its money so he could use later use the Trust's funds for himself and the other Defendants.

60.     Flagstad reasonably induced the Trust through his false representations to invest funds into Folding Light and Channel Clarity and it did so.

61.     Flagstad's representations and the Defendants' wrongful conduct constitute fraud.

62.     The Plaintiffs have incurred damages in excess of $2,200,000.

63.     The Plaintiffs have no adequate remedy at law. Money damages alone will not, and cannot, compensate the Trust, Folding Light and Channel Clarity for the loss of goodwill, or the loss of business opportunities, which they will suffer as a result of the actions of these Defendants.

64.     By their conduct, Defendants have demonstrated their willingness to continue to engage in continuous fraudulent acts. It is clear that the injury to the Trust, Folding Light and Channel Clarity is immediate and irreparable.

65.     The Plaintiffs have demonstrated that these Defendants have, and unless restrained will continue to, engage in conduct which is alleged herein. There is a likelihood that the Plaintiffs will prevail on the merits of this action.

66.     Should the Court grant interlocutory injunctive relief to the Plaintiffs the burden on these Defendants will be slight compared to the injury to the Plaintiffs if it is not granted. No injury to these Defendants will result from an order which requires these Defendants to comport their actions to the law.

67.     The granting of an injunction will not disserve the public interest. Indeed, injunctive relief would protect against the continuing fraud that Flagstad and the Defendants continue to engage in.

68.     Whereas here, Flagstad and the Defendants are business operations that are permeated by fraud, the Plaintiffs have made the requisite showing that assets will be dissipated during the pendency of the proceedings unless Defendants' assets are frozen and a receiver appointed to marshal and protect them.

## COUNT III
### (Conversion/Theft)
### (All Defendants)

69.     Plaintiffs reallege paragraphs 1 through 42 as though fully set forth herein.

70.     Folding Light received from the Trust $2,000,000 in funds for use as trading capital and which were not to be used for Folding Light business operations.  Flagstad and the other Defendants had no legal right to take or use Folding Light funds the Trust had invested in Folding Light.  Channel Clarity received from the Trust $200,000 in funds for use as operating capital and to build the business of Channel Clarity.  Flagstad and the other Defendants had no legal right to take or use Folding Light funds the Trust had invested in Channel Clarity.

71.     Beginning at least in 2018 Flagstad, and the other Defendants began fraudulently taking Folding Light and Channel Clarity cash into their accounts.  This conduct occurred without the Plaintiffs consent and to Plaintiffs' detriment.

72.     The wrongful cash transfers amount to at least $849,000.

73.     The cash transfers constituted the conversion of funds from Channel Clarity and Folding Light.  None of the funds converted have been repaid to Channel Clarity, Folding Light or returned to the Trust.

74.     Defendants continue to possess, control, or have wrongfully benefitted from their conversion of Channel Clarity and Folding Light cash and the Trust's investment funds.

75.     Defendants wrongfully assumed control and possession of Channel Clarity and Folding Light cash from its bank accounts.

76.     The Trust has made demand upon the Defendants for the return of the cash stolen.

77.     Despite the Trust's demands for payment, the Defendants have refused and continue to refuse to return the stolen cash.

78.     The Plaintiffs have no adequate remedy at law.  Money damages alone will not, and cannot, compensate the Plaintiffs for the loss of goodwill, or the loss of business opportunities, which they will suffer as a result of the Defendants actions.

79.     Defendants conduct demonstrates their willingness to continue to engage in the conversion and theft of Channel Clarity and Folding Light assets.  It is clear that the injury to the Plaintiffs is immediate and irreparable.

80.     The Plaintiffs have demonstrated that these Defendants have, and unless restrained will continue to, engage in conduct which is alleged herein.  There is a likelihood that the Plaintiffs will prevail on the merits.

81.     Should the Court grant interlocutory injunctive relief to the Plaintiffs, the burden on these Defendants will be slight compared to the injury to the Plaintiffs if it is not granted.  No injury to these Defendants will result from an order which requires these Defendants to comport their actions to the law.

82.     The granting of an injunction will not disserve the public interest.  Indeed, injunctive relief would protect against Flagstad and the other Defendants from continuing the ongoing fraud.

83.     Whereas here, the Defendant businesses are permeated by fraud, the Plaintiffs have made the requisite showing that assets will be dissipated during the pendency of the proceedings unless Defendants' assets are frozen and a receiver appointed to marshal and protect them.

**COUNT IV**
**(Breach of Fiduciary Duty)**
**(Flagstad)**

84.     Plaintiffs reallege paragraphs 1 through 42 as though fully set forth herein.

85.    At all times relevant hereto, Flagstad was a Folding Light Member and acted as its Lead Manager and was an agent for his principal Folding Light.  Flagstad was also a Channel Clarity Member and acted as its Chief Executive Officer and was an agent for his principal Channel Clarity.

86.    As an agent for Folding Light and as its Lead Member, Flagstad had a fiduciary duty of loyalty and good faith and is required to behave in a manner consistent with and solely with Folding Light and the Trust's best interest.  As an agent for Channel Clarity, and as its Chief Executive Officer, Flagstad had a fiduciary duty of loyalty and good faith and is required to behave in a manner consistent with and solely with Channel Clarity and the Trust's best interest.

87.    Flagstad was further required to preserve and promote Channel Clarity's and Folding Light's business and to preserve its assets for Channel Clarity's and Folding Light's benefit and its members, including the Trust.

88.    Flagstad intentionally and willfully breached his fiduciary duty owed to Channel Clarity and Folding Light and the Trust by embezzling cash and assets from Channel Clarity and Folding Light and transferring it to himself and the other Defendants. He further breached his fiduciary duty by unlawfully accessing Channel Clarity and Folding Light computers as alleged herein.

89.    Flagstad has further breached his fiduciary duty by using Folding Light assets to manipulate and control litigation in the pending case of  Folding Light, LLC v. Kasey Klaas, et al., Case No. 1:19-cv-03949 (N.D. Ill. filed June 12, 2019). Flagstad who continues to wrongfully exercise control over Folding Light assets, is refusing to pay legal fees to Folding Light's counsel in an effort to torpedo the case and avoid pending counterclaims against him,

producing discovery, and giving sworn testimony. At the same time, Flagstad has taken and is using Folding Light assets to pay his personal attorney's legal fees associated with the case, as well as attorney fees to his attorney associated with other litigations in which he is embroiled. Flagstad's reprehensible conduct is jeopardizing Folding Light's pending federal claims and is continuing to decimate the Trust's investment and interests in Folding Light.

90.     Flagstad further breached his fiduciary duty owed to the Trust, Channel Clarity and Folding Light by otherwise generally mismanaging Channel Clarity and Folding Light assets and by the unlawful conduct alleged herein.

91.     As a direct and proximate result of one or more of Flagstad's foregoing wrongful acts or omissions, Flagstad has caused and is causing irreparable harm, as well as substantial monetary damages to the Plaintiffs in an amount of at least $2,200,000. The Plaintiffs have no adequate remedy at law. Money damages alone will not, and cannot, compensate the Plaintiffs for the loss of goodwill, or the loss of business opportunities, which they will suffer as a result of Flagstad's illegal actions.

**COUNT V**
**(Breach of Contract)**
**(Flagstad)**

92.     Plaintiffs reallege paragraphs 1 through 42 as though fully set forth herein.

93.     The Trust acquired an interest in Folding Light pursuant to the Folding Light Limited Liability Agreement effective as of February 1, 2018 ("the Agreement") and attached hereto as Exhibit A.

94.     The Trust has fully performed all obligations under the Agreement.

95.     Pursuant to the terms of the Agreement, among other things, Flagstad was to act in the best interest of Folding Light and its Members. Flagstad as a Member and Lead Manager furthermore had fiduciary duties owed to Folding Light and its Members, including the Trust.

96.     The Agreement further requires unanimous written consent of the Members before the Company or its Mangers could dilute a Members' interest as Flagstad did here with the outright theft of Folding Light cash.  The Agreement also requires that Flagstad as a Folding Light Manager and its Lead Manager keep or cause to be kept complete and accurate books and records of the Company along with supporting documentation for transactions with respect to the conduct of the Company's business.  Flagstad materially breached the Agreement in failing to keep or have kept accurate books and records as the Agreement requires and the additional unlawful conduct alleged herein.

97.     Flagstad further materially breached the Agreement in acquiring real and/or personal property through converted Folding Light cash wrongfully transferred to either himself or the other Defendants.

98.     Flagstad's conversion of Folding Light cash constitutes a material breach of the Agreement.

99.     The Trust has made demand upon Flagstad for the return of the cash stolen from Folding Light.  The Trust has further made a demand upon Flagstad for an accounting and to inspect the books and records of Folding Light which has he has failed or refused to provide.

100.     Despite the Trust's demands for payment, Flagstad has refused and continues to refuse to return the cash converted from Folding Light.

101.     The Agreement provides that in the event of a breach or even threatened breach of one or more provisions of the Agreement, that the party who is or may be injured shall be entitled to the following preliminary and permanent injunctive relief (i) restraining and enjoining any act which would constitute a breach, (ii) compelling the performance of any obligation under the Agreement that if not performed would constitute a breach of the Agreement, and such relief

may be obtained without the showing of actual irreparable harm and no bond or security shall need to be furnished.

**COUNT VI**
**(Civil Conspiracy)**
**(All Defendants)**

102.    Plaintiffs reallege paragraphs 1 through 42 as though fully set forth herein.

103.    The Defendants acted in concert, and conspired with each other to violate the common law as alleged herein in the preceding Counts III, IV, V and VI.  Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint were aware of the conspiracy and knowingly participated therein.  Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint participated in accepting and wrongfully transferring funds from Channel Clarity and Folding Light in coordination with Flagstad.  The scheme Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint participated in led to the conversion of Folding Light trading capital and working capital which the Trust had invested in Folding Light and Channel Clarity. Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint acted in concert to commit illegal acts, including but without limitation, the claims alleged herein.

104.    Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint had a meeting of the minds on the course of action as alleged in the preceding Counts II, III, IV and V, including the conversion, and wrongful use of Channel Clarity and Folding Light cash the Trust had provided through its investment.

105.    The Trust's damages, including but not limited to the diminution of the value of Channel Clarity and Folding Light and loss of business opportunities, cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to

compensatory and punitive relief. Furthermore, the Agreement permits and allows for injunctive relief under these circumstances of a material breach as Flagstad has done herein.

106.    Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint's actions will continue to cause harm to the Plaintiffs unless restrained.

107.    Should this court grant injunctive relief to the Plaintiffs, the burden on the Defendants would be slight compared to the injury to the Plaintiffs if it was not granted. No injury to the Defendants would result from an order requiring them to comport their actions under the law. There is a likelihood that the Plaintiffs will prevail on the merits.

108.    The granting of an injunction will not disserve the public interest. Indeed, granting the injunction would ensure that the Defendants are not able to injure others with their continued unlawful conduct.

## COUNT VII
### (Accounting)
### (All Defendants)

109.    Plaintiffs reallege paragraphs 1 through 42 as though fully set forth herein.

110.    Flagstad's conduct as alleged herein constitutes fraud, conversion and breaches of his fiduciary duties to Channel Clarity, Folding Light and its members, including the Trust.

111.    Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint, through their actions and outright theft of Channel Clarity and Folding Light cash have funneled assets to various persons and entities unknown to the Trust.

112.    The Trust has made a demand for an accounting from  Folding Light to Flagstad as Folding Light's Lead Manager, and from Channel Clarity to Flagstad as its Chief Executive Officer and as the controlling Member of Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint, and Flagstad has refused to provide one.

113.    The Trust is entitled to an accounting because of Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint's conversion of Channel Clarity and Folding Light assets, and fraud, conversion and breach of fiduciary duties as alleged herein.  The accounting requested should be conducted in equity because:

- The Trust has no adequate remedy at law for an accounting;

- The accounting would be complex and intricate as Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint have engaged in numerous complex scams in order to steal Channel Clarity, Folding Light and the Trust's assets; and

- The total amounts due from Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint are unknown to the Trust because the individual Defendants have exclusive knowledge of the accounts and cash transfers made from Channel Clarity and Folding Light and in and out of Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint.  Only Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint have the records necessary to conduct an accounting that would reveal how and when assets were taken from Channel Clarity and Folding Light and have deleted or altered Channel Clarity and Folding Light confidential financial information.

### RELIEF REQUESTED COUNTS II – VII.

WHEREFORE, the Plaintiffs pray for the following relief against Defendants Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint:

a.   Entry of a preliminary and permanent injunction against these Defendants, and each of them, from engaging in acts and practices in violation of the law;

b.   Entry of a preliminary and permanent injunction against these Defendants, and each of them, enjoining and restraining them from destroying or disposing of any books, records, or accounts or of any property, whether real, personal, or mixed;

c.   Entry of a preliminary and permanent injunction enjoining and restraining any Defendant or person acting on their behalf, from withdrawing transferring or disposing of any property owned by these Defendants and each of them whether real, personal, or mixed;

d.   Entry of an order appointing a receiver with the power to sue for, collect, receive and take into his possession all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books, records, documents, papers, choses in action, bills, notes and property of every description, which were derived by means of the illegal practices described above;

e.   An order compelling Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint to account for all transactions with Channel Clarity and Folding Light;

f.   A judgment entered in favor of the Plaintiffs and against Flagstad, Oxford Marketing, Oxford Tax, Oxford Media, Oxford FG, Oxford GP, FFA and Cloverpoint for all loses sustained resulting from the Defendants' fraud, conversion, and Flagstad's breach of fiduciary duties

g.     Entry of a judgment in favor of the Plaintiffs against the Defendants, and each of them, for compensatory damages in an amount to be proven at trial, but which is not less than $2.2 million;

h.     An award of punitive damages in an amount to be proven at trial;

i.     The imposition of a constructive trust on these Defendants on all monies or property obtained by or through their wrongful conduct as alleged herein;

j.     An order prohibiting the Defendants from filing a petition for relief under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.,* without prior permission from this Court;

k.     An order awarding the Trust its costs and attorney's fees; and

l.     Such further and additional relief as the Court may deem appropriate.

Dated:  May 4, 2021                Respectfully submitted,

By: */s/ William K. Kane*
William K. Kane, Esq. (6194466)
David M. Poell, Esq. (6302765)
SHEPPARD MULLIN RICHTER & HAMPTON LLP
Three First National Plaza
70 West Madison Street, 48th floor
Chicago, Illinois 60602
Telephone:  312.499.6300
Facsimile:  312.499.6301
wkane@sheppardmullin.com
dpoell@sheppardmullin.com

*Counsel for Plaintiffs,* The James Streibich Revocable Trust of 2002, an Illinois Trust, individually, and derivatively, on behalf of Folding Light, LLC, a Delaware Limited Liability Company; and Channel Clarity Holdings, LLC, a Delaware Limited Liability Company

# Exhibit A

FOLDING LIGHT, LLC LIMITED LIABILITY
COMPANY AGREEMENT


Effective as of February 1, 2018


THE INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE FEDERAL OR STATE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR AN EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFER SET FORTH HEREIN.

Table of Contents

**ARTICLE 1 DEFINITIONS**.................................................................................................**4**
**ARTICLE 2 ORGANIZATIONAL MATTERS**..............................................................**14**
   2.1.   Formation of the Company .............................................................................14
   2.2.   Name....................................................................................................................14
   2.3.   Purpose ...............................................................................................................14
   2.4.   Location of Principal Place of Business .......................................................14
   2.5.   Registered Office and Registered Agent .....................................................14
   2.6.   Members ............................................................................................................14
   2.7.   Term.....................................................................................................................14
   2.8.   No State Law Partnership. ...............................................................................14
**ARTICLE 3 INTERESTS AND CAPITAL CONTRIBUTIONS** .............................**15**
   3.1.   Interests...............................................................................................................15
   3.2.   Initial Capital Contributions ..........................................................................16
   3.3.   Additional Capital Contributions ..................................................................16
   3.4.   Return of Capital Contributions.....................................................................16
   3.5.   Capital Accounts...............................................................................................16
   3.6.   Representations, Warranties and Covenants of the Members ....................16
**ARTICLE 4 DISTRIBUTIONS** .....................................................................................**18**
   4.1.   Distributions to Members ...............................................................................18
   4.2.   Tax Distributions ..............................................................................................18
   4.3.   Limitation on Distributions ............................................................................18
   4.4.   Withholding .......................................................................................................18
**ARTICLE 5 PROFITS AND LOSSES** ........................................................................**19**
   5.1.   Allocation of Profits and Losses ...................................................................19
   5.2.   Loss Limitation.................................................................................................19
   5.3.   Minimum Gain Chargeback. ..........................................................................19
   5.4.   Member Nonrecourse Debt Minimum Gain Chargeback. .........................20
   5.5.   Qualified Income Offset .................................................................................20
   5.6.   Nonrecourse Deductions. ................................................................................20
   5.7.   Member Nonrecourse Deductions .................................................................20
   5.8.   Curative Allocations ........................................................................................20
   5.9.   Allocations for Income Tax Purposes...........................................................20
**ARTICLE 6 POWERS, RIGHTS AND DUTIES OF THE MANAGER AND MEMBERS**
.....................................................................................................................................**21**
   6.1.   Management of the Company.........................................................................21
   6.2.   Compensation; Reimbursement of Expenses ..............................................22
   6.3.   Duties and Time Devoted to Business of the Members; Other Activities; Transactions
   with Affiliates; No Employment Rights .......................................................22
   6.4.   Rights of the Members.....................................................................................23
   6.5.   Liability and Indemnification. ........................................................................24
   6.6.   Covenants of the Members .............................................................................25
   6.7.   Intellectual Property.........................................................................................27
   6.8.   Buy-Sell Procedures ........................................................................................28
   6.9.   Management Fees .............................................................................................30

3

**ARTICLE 7 TRANSFER OF MEMBERSHIP RIGHTS AND INTERESTS;**
**WITHDRAWAL OF MEMBERS**................................................................**30**
7.1.  Transfers ...........................................................................................30
7.2.  Permitted Transfers ...........................................................................31
7.3.  Voluntary Withdrawal of Members ....................................................32
7.4.  Transfers by Operation of Law, Involuntary Withdrawal or Breach of this Agreement. 32
7.5.  Consequences of Withdrawal .............................................................34
7.6.  Transferees Bound by Agreement .......................................................34
**ARTICLE 8 DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE**
**COMPANY** ................................................................................................**34**
8.1.  Dissolution. .......................................................................................34
8.2.  Procedure for Winding Up .................................................................35
8.3.  Distributions at Liquidation. ..............................................................35
8.4.  Negative Capital Account ..................................................................36
8.5.  Termination. ......................................................................................36
**ARTICLE 9 BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS** ..................**36**
9.1.  Bank Accounts ...................................................................................36
9.2.  Books and Records ............................................................................36
9.3.  Annual Accounting Period and Taxable Year .....................................37
9.4.  Reports ..............................................................................................37
9.5.  Tax Representative .............................................................................37
9.6.  Tax Elections .....................................................................................37
9.7.  Title to Company Property .................................................................37
**ARTICLE 10 AMENDMENTS AND WAIVERS** ................................................**37**
10.1.  Amendments and Waivers .................................................................37
10.2.  Amendments Without Consent of the Members ..................................38
**ARTICLE 11 GENERAL PROVISIONS**..........................................................**38**
11.1.  Uniform Commercial Code .................................................................38
11.2.  Further Assurances ............................................................................38
11.3.  Notifications .....................................................................................38
11.4.  Specific Performance .........................................................................39
11.5.  Complete Agreement .........................................................................39
11.6.  Applicable Law; Venue; Attorney's Fees ...........................................39
11.7.  Section Titles ....................................................................................39
11.8.  Binding Provisions.............................................................................40
11.9.  No Third Party Beneficiaries .............................................................40
11.10.  Terms ................................................................................................40
11.11.  Severability of Provisions ..................................................................40
11.12.  Counterparts, Facsimile; Reproductions ............................................40

## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## FOLDING LIGHT, LLC

This LIMITED LIABILITY COMPANY AGREEMENT of Folding Light, LLC (the "Company") is effective as of February 1, 2018, by and among the Members (as defined below) and the Lead Manager (as defined below) executing this Agreement from time to time in accordance with the terms hereof. The parties hereto agree as follows:

### EXPLANATORY STATEMENTS

A.     The Company was formed pursuant to a Certificate of Formation (the "Certificate") filed with the Secretary of State of Delaware on January 16, 2018 (the "Organization Date").

B.     The parties agree that the terms of this Agreement shall govern, regulate and manage the affairs of the Company.

### ARTICLE 1
### DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article 1, unless otherwise defined elsewhere herein:

"Act" means the Delaware Limited Liability Company Act, as amended from time to time.

"Additional Capital Contribution" shall have the meaning ascribed to such term in Section 3.3(a).

"Adjusted Capital Account Deficit" means with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant allocation year, after giving effect to the following adjustments: (i) Credit to such Capital Account any amounts that such Member is deemed obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and (ii) Debit to such Capital Account the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6). The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Affiliate", with respect to any Person, means: (i) any other Person owning 50% or more of the voting or beneficial interests of the subject Person; (ii) any other Person directly or indirectly controlling, controlled by or under common control with the subject Person; (iii) any manager, officer, director, trustee or general partner of the subject Person; (iv) any individual who is a Family Member of the subject Person; (v) any trust for the benefit of the subject Person; (vi) any trust for the benefit of any Family Member of the subject Person; or (v) any Person in

5

which more than 50% of the voting or beneficial interests are owned by a Person who has a relationship with the subject Person described in clause (i), (ii), (iii) or (iv) above.

"Agreement" means this Limited Liability Company Agreement, as amended from time to time in accordance with its terms.

"Applicable Law" means (i) the provisions of all applicable statutes and laws of the United States of America, the states thereof (including the Act), and all other countries in which the Company is then doing business, and (ii) the constitution, by-laws, rules, regulations, orders, regulatory circulars, fee policies, customs and usage of any United States, state or foreign governmental, regulatory or self-regulatory authority having jurisdiction over the Company, its assets or business.

"Asset Under Management Value" means the value of all the assets under the management of the Company, including all cash and cash equivalents, interest and dividends receivable plus the market value of all open investments maintained by the Company minus all accrued liabilities of the Company minus Reserves, determined in accordance with generally accepted accounting principles.

"Bankruptcy" means, with respect to a Member, the happening of any of the following: (i) the filing of an application by such Member for, or a consent to, the appointment of a trustee of all or a portion of such Member's assets for the benefit of creditors generally, (ii) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay such Member's debts generally as they come due, (iii) the making by such Member of a general assignment for the benefit of creditors or (iv) the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member as bankrupt or appointing a trustee of all or a portion of such Member's assets for the benefit of creditors generally, and such order, judgment or decree continuing unstayed and in effect for a period of 90 days.

"BBA" shall have the meaning ascribed to such term in Section 9.5.

"Business Day" means any day other than Saturday, Sunday and a day on which commercial banks are authorized or required to close in Chicago, Illinois.

"Business of the Company" shall have the meaning ascribed to such term in Section 6.3(d).

"Capital Account" means, with respect to each Member, the account established and maintained for such Member on the books of the Company in compliance with Regulation § 1.704-1(b)(2)(iv). For this purpose, the Managers may, in the Managers' sole discretion, upon the occurrence of any of the events specified in Regulation §1.704-1(b)(2)(iv)(g), increase or decrease the Capital Accounts in accordance with rules of such regulation and Regulation §1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property. Without limiting the generality of the foregoing, each Member's Capital Account shall be (i) increased by (x) the amount of money contributed by such Member to the Company, (y) the fair market value of property contributed by such Member to the Company (net of liabilities that the Company is considered to assume or take

6

subject to pursuant to Section 752 of the Code), and (z) allocations to such Member of Profits and other items of income and gain, including income and gain exempt from tax, but excluding (for federal income tax purposes) items of income and gain as described in Section 1.704-1(b)(4)(i) of the Regulations; and (ii) decreased by (x) the amount of money distributed to such Member, (y) the fair market value of any property distributed to such Member (net of any liabilities that such Member is considered to assume or take subject to pursuant to Section 752 of the Code), and (z) such Member's share of Losses and other items of loss and deduction, but excluding (for federal income tax purposes) items of loss or deduction as described in Section 1.704-1(b)(4)(i) of the Regulations.

"Capital Contribution" means the total amount of cash and the Gross Asset Value of any other assets contributed to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"Capital Transaction" means any transaction pursuant to which the Company sells its property or business by (i) a sale or conveyance of all or substantially all of the Company's properties or assets to any Person, (ii) a sale or conveyance of a majority of the equity interests in the Company to any Person or (iii) a merger or consolidation of the Company with any Person pursuant to which the Members of the Company shall own, immediately after giving effect thereto, less than a majority of the equity interests of the surviving entity (or its parent) or the purchasing entity (or its parent), as the case may be.

"Certificate" shall have the meaning ascribed to such term in the Explanatory Statement.

"Class A Interests" means an Interest having the rights and obligations specified with respect to Class A Interests in this Agreement.

"Class B Interests" means an Interest having the rights and obligations specified with respect to Class A Interests in this Agreement.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Company" (including as defined in the introductory paragraph of this Agreement) means the limited liability company formed pursuant to the Certificate.

"Company Asset" means any property or asset of the Company; and "Company Assets" means the aggregate of all the property and assets of the Company.

"Company Minimum Gain" has the same meaning as "partnership minimum gain" set forth in Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

"Confidential Information" shall have the meaning ascribed to such term in Section 6.6(c).

"Control" or "control" means (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such

7

Person, whether through the ownership of voting securities, by contract or otherwise.

"Continuing Member" shall have the meaning ascribed to such term in Section 6.8(c).

"Corporate Opportunities" shall have the meaning ascribed to such term in Section 6.3(c).

"Counter Offer" shall have the meaning ascribed to such term in Section 6.8(b).

"Created" shall have the meaning ascribed to such term in Section 6.7(a).

"Creation" shall have the meaning ascribed to such term in Section 6.7(a).

"Disability" means the inability of a Member, including a Member acting in position of a Manager, to perform the essential employment functions and other duties and responsibilities of such Member, with or without reasonable accommodation, by reason of a physical or mental infirmity, for a period of 180 consecutive days. Such period of 180 consecutive days shall he deemed continuous unless such Member returns to the Company and performs such employment functions and other duties and responsibilities for at least 15 consecutive Business Days during such period and performs during such period at the level and competence that existed prior to the beginning of such 180 consecutive day period. The determination of Disability shall be made by a physician mutually satisfactory to the Member which is not the subject of such Disability and the Member which is the subject of such Disability (or such Member's representative, as the case may be). The date of such Disability shall be the date of the first day of such 180 consecutive days period.

"Family Member" means, with respect to any individual, such individual's spouse, children and grandchildren.

"Fiscal Year" means each twelve-month period (or portion thereof) beginning on January 1 and ending on December 31 of each year.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset, as determined by the Managers in the Managers' reasonable discretion;

(b) The Gross Asset Values of all Company Assets shall be adjusted by the Managers to equal their respective fair market values (unless otherwise determined by the Managers in the Managers' reasonable discretion) as of the following:

(i) The acquisition of additional Interests by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Managers reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

8

(ii)     The grant of an Interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a Member capacity, or by a new Member acting in a Member capacity or in anticipation of becoming a Member;

(iii)    The distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest if the Managers reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(iv)     The liquidation of the Company within the meaning of Regulation § 1.704-1(b)(2)(ii)(g).

(c)     The Gross Asset Value of any Company Assets distributed to any Member shall be the gross fair market value of such asset, as determined by the Managers in the Managers' reasonable discretion, on the date of such distribution; and

(d)     The Gross Asset Values of Company Assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining capital accounts pursuant to Regulation § 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this subsection (d) to the extent that the Managers determine that an adjustment pursuant to subsection (b) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d).

"Initial Capital Contribution" shall have the meaning ascribed to such term in Section 3.1.

"Initial Interests Value" shall have the meaning ascribed to such term in Section 6.8(a).

"Intellectual Property" means the rights associated with or arising out of any of the following: (i) domestic and foreign patents and patent applications, together with all reissuances, divisionals, continuations, continuations-in-part, revisions, renewals, extensions, and reexaminations thereof, and any identified invention disclosures; (ii) trade secret rights and corresponding rights in confidential information and other non-public information (whether or not patentable), including ideas, formulas, compositions, inventor's notes, discoveries and improvements, know-how, manufacturing and production processes and techniques, testing information, research and development information, inventions, invention disclosures, unpatented blueprints, drawings, specifications, designs, plans, proposals and technical data, business and marketing plans, market surveys, market know-how and customer lists and information (iii) all copyrights, copyrightable works, rights in databases, data collections, "moral" rights, mask works, copyright registrations and applications therefor and corresponding rights in works of authorship; (iv) all trademarks, service marks, logos, trade dress and trade names and domain names indicating the source of goods or services, and other indicia of commercial source or origin (whether registered, common law, statutory or otherwise), all registrations and applications to register the foregoing anywhere in the world and all goodwill associated therewith; (v) all computer software and code, including assemblers, applets, compilers, source code, object code, development tools, design tools, user interfaces and data, in any form or format, however fixed; and (vi) all Internet

domain names, electronic addresses, websites, proprietary symbol sets and proprietary voices, uniform resource locators and alphanumeric designations associated therewith and all registrations for any of the foregoing.

"Interest" means a direct ownership interest in the Company entitling the holder thereof to receive a share of distributions, and a share of the Profits and Losses, of the Company in accordance with the terms of this Agreement.

"Interest Purchase Agreement" means that certain Interest Purchase Agreement set forth in Exhibit 6.8(e).

"Investor" means any Person who has invested with, or provided funds (whether by a capital investment, debt investment or otherwise) to, the Company or its Affiliates.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

        (i)     the Bankruptcy of such Member;

        (ii)    if such Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

        (iii)   if such Member is a partnership or a limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

        (iv)   if such Member is a corporation, the dissolution of the corporation or the revocation of its charter; provided, however, the revocation of the charter of a Member shall not be deemed an Involuntary Withdrawal if such charter is revived within ninety (90) days thereafter;

        (v)    if such Member is an individual, such Member's death, Disability or Unauthorized Leave of Absence;

        (vi)   if such Member is an estate, the distribution by the fiduciary of the estate's entire Interest in the Company; or

        (vii)  any other event causing the resignation of such Member under the Act other than a Voluntary Withdrawal.

"LIBOR Rate" means, for any day, an interest rate per annum equal to the interest rate set forth on the key rates page of www.bloomberg.com as the British Bankers Association's 30- month London Interbank Offered Rate (LIBOR) (or an equivalent rate) for such day, or, if such interest rate shall not be so set forth for such day, for the then most recent day for which such interest rate is so set forth.

"Liquidating Agent" shall have the meaning ascribed to such term in Section 8.2(a).

"LLC IP" shall have the meaning ascribed to such term Section 6.6(b)

"Major Decisions" shall have the meaning ascribed to such term in Section 6.1(c).

"Majority-in-Interest of the Members" means Members whose aggregate Percentage Interests exceed 50% of the Percentage Interests of all Members.

"Manager" means each Person elected or appointed to be a Manager in accordance with Article 6 hereof. References to the Manager in the singular or as him, her, it, itself or other like references shall also, where the context so requires, be deemed to include the plural or masculine or feminism reference, as the case may be.

"Member" means each Person listed as a Member on Schedule A attached hereto and any Person who subsequently is admitted as a Member of the Company in accordance with the terms of this Agreement, each of which shall be added to such list of Members. Any Person who subsequently ceases to be a Member of the Company in accordance with the terms of this Agreement shall be removed from such list of Members.

"Member Nonrecourse Debt" has the same meaning as the term "partner nonrecourse debt" set forth in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(3).

"Membership Rights" means all the rights of a Member in the Company subject to the terms and conditions of this Agreement, including a Member's: (i) Interests; (ii) right to inspect the Company's books and records, subject to the terms and conditions of Section 9.2 hereof; and (iii) right to vote on matters coming before the Members (if any), subject to the terms and conditions of Article 6 hereof.

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Net Cash Flow" means, with respect to any period, all revenues, funds and proceeds received by the Company from any source, including Capital Transactions (but excluding Capital Contributions), (a) less the sum of (i) all expenses of the Company paid or incurred during such period, (ii) all payments of principal or interest with respect to indebtedness of the Company owing to any Person, (iii) all capital expenditures of the Company paid during such period and (iv) all additions to Reserves established during such period, and (b) plus all reductions of such established Reserves during such period. Net Cash Flow shall be determined by the Managers in the Managers' reasonable discretion.

"Nonrecourse Deductions" shall have the meaning set forth in Regulation Sections 1.704-2(b)(1).

"Nonrecourse Liability" shall have the meaning set forth in Regulations Section 1.704-

2(b)(3).

"Operation of Law Transfer" shall have the meaning ascribed to such term in Section 7.4(a).

"Organization Date" shall have the meaning ascribed to such term in the Explanatory Statement.

"Percentage Interest" means, with respect to any Member as of any determination date, the percentage set forth opposite such Member's name on Schedule A hereto, as such Schedule A may be amended from time to time in accordance herewith.

"Person" means any individual, corporation, partnership, association, limited liability company, trust, estate or other entity.

"Potential Investor" means a potential Investor in the Company or its Affiliates with whom a Member had personal contact or dealings on behalf of the Company during the period such Member was a Member of the Company regarding an investment in the Company.

"Profits" and "Losses" for any period means all items of Company income and gain (in the case of Profits) and all items of Company loss, deduction and expense (in the case of Losses) for such period; provided that, for purposes of computing the amount of any item of income, gain, loss, deduction or expense to be reflected in Capital Accounts, the determination, recognition and classification of each such item shall be the same as its determination, recognition and classification for federal income tax purposes except that:

(i)     The computation of all items of income, gain, loss and deduction shall include those items described in Sections 705(a)(l)(B) or 705(a)(2)(B) of the Code and Regulation Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includable in gross income or are not deductible for federal income tax purposes.

(ii)    If the Gross Asset Value of any property is adjusted pursuant to Regulation Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such property.

(iii)   Items of income, gain, loss or deduction attributable to the disposition of property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall be computed by reference to the Gross Asset Value of such property.

(iv)    Items of depreciation, amortization and other cost recovery deductions with respect to property having a Gross Asset Value that differs from its adjusted basis for tax purposes shall be computed by reference to the property's Gross Asset Value in accordance with Regulation Section 1.704-1(b)(2)(iv)(g).

(v)     To the extent an adjustment to the adjusted tax basis of any asset pursuant to Sections 732(d), 734(b) or 743(b) of the Code is required, pursuant to Regulation Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount

12

of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

(vi)    To the extent that the Company distributes any asset in kind, the Company shall be deemed to have realized Profit or Loss thereon in the same manner as if the Company had sold such asset for an amount equal to the fair market value of such asset or, if greater and otherwise required by the Code, the amount of debts to which such asset is subject.

(vii)    All items specially allocated pursuant to Sections 5.2-5.8 shall not be taken into account in determining Profits and Losses.

"Regulations" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Reserves" means a reasonable amount of funds deemed sufficient by the Managers in the Managers' reasonable discretion, as of the date of determination, for working capital, capital required by Applicable Law, capital expenditures, and capital used to pay debt service and other costs and expenses incident to the operation of the Company.

"Restricted Period" shall have the meaning ascribed to such term in Section 6.6(a).

"Restrictive Covenants" shall have the meaning ascribed to such term in Section 6.6(e).

"SEC" means the Securities and Exchange Commission.

"Secretary of State" means the Secretary of State of the State of Delaware.

"Securities Act" means the Securities Act of 1933, as amended.

"Tax Representative" shall have the meaning ascribed to such term in Section 9.5.

"Tax Proceeding" shall have the meaning ascribed to such term in Section 9.5.

"Third Party Claim" shall have the meaning ascribed to such term in Section 6.5(c).

"Trading" means to acquire, dispose of and otherwise trade financial products by means of buying, selling, spreading, arbitraging, or otherwise trading, whether long or short, directly or indirectly, or as a market maker or otherwise.

"Trading Risk Factors" means, as established and revised from time to time by the Management Committee, the policies and guidelines governing the management of risk associated with the trading of securities and any other business or activity conducted from time to time by the Company.

"Transfer" means, when used as a noun, any sale, exchange, encumbrance, disposition, hypothecation, pledge, assignment, distribution, attachment, mortgage or other transfer or grant of

rights or interests, whether voluntarily or involuntarily, by operation of law or otherwise, and, when used as a verb, means, to sell, exchange, encumber, dispose, hypothecate, pledge, assign, distribute, mortgage or otherwise transfer or grant rights or interests, whether voluntarily or involuntarily, by operation of law or otherwise.

"Transferred Interests" shall have the meaning ascribed to such term Section 7.2(e).

"Unauthorized Leave of Absence" means, as to a Member, that, within any 12 month period, such Member, including a Member acting in a position of a Manager, for any reason other than due to a Disability, fails to perform on a full-time basis (meaning at least 7:30 a.m. to 5:30 p.m. each Business Day) the essential employment functions and other duties and responsibilities of such Member for the Company a period in excess of 90 Business Days.

"Unreturned Initial Capital" means, with respect to any Interest, as of any date of determination, an amount equal to the excess, if any, of (a) Initial Capital Contributions made or deemed made in exchange for or on account of such Interest, over (b) all Distributions made by the Company with respect to such Interest pursuant to Section 4.1(b).

"Unreturned Additional Capital" means, with respect to any Interest, as of any date of determination, an amount equal to the excess, if any, of (a) Additional Capital Contributions made or deemed made in exchange for or on account of such Interest, over (b) all Distributions made by the Company with respect to such Additional Capital Contributions pursuant to Section 4.1(a).

"Voluntary Withdrawal" means a Member's voluntary withdrawal from the Company or a Member's resignation from the Company by such Member's express will or other voluntary act.

"Withdrawing Member" shall have the meaning ascribed to such term in Section 6.8(c).

"Work" means all Intellectual Property which a Member, directly or indirectly, alone or jointly Creates on or after the date of this Agreement, or causes another to Create, on or after the date of this Agreement. Notwithstanding anything in this Agreement to the contrary, the definition of "Work" does not include, and this Agreement does not apply to, any invention developed by a Member (i) entirely on his own time and (ii) without the use of any equipment, supplies, facilities or trade secret information of the Company, unless such invention (x) relates to business of the Company or its actual or demonstrably anticipated research or development or
(y) results from any work or services performed by such Member for or on behalf of the Company.

# ARTICLE 2
# ORGANIZATIONAL MATTERS

2.1.    Formation of the Company. The Company was formed upon the execution and filing of the Certificate with the Secretary of State on the Organization Date. The Managers shall accomplish all filings, recordings, publishings and other acts necessary or appropriate for compliance with all the requirements for the formation and continued existence of the Company as a limited liability company under the Act and under all other laws of the State of Delaware or such other jurisdictions in which the Managers determine that the Company may conduct business. This Agreement is the Company's operating agreement, as that term is used in the Act. The rights and duties of the Managers and Members shall be as provided in this Agreement and, to the extent not inconsistent with the terms of this Agreement, in the Act.

2.2.    Name. The name of the Company is "Folding Light, LLC", as such name may be modified from time to time by the Managers. The Managers shall notify the Members of any such change.

2.3.    Purpose. The purpose of the Company shall be to engage in any lawful business, purpose, investment or activity for which limited liability companies may be organized under the Act.

2.4.    Location of Principal Place of Business. The location of the principal place of business of the Company is 215 West Ohio Street, Chicago, Illinois 60654, or such other location as may be determined by the Managers. The Managers may change the location of the principal place of business of the Company and shall notify the Members of such change. In addition, the Company may maintain such other offices as the Managers may deem advisable at any other place or places within or without the United States.

2.5.    Registered Office and Registered Agent. The Company's initial registered office and registered agent shall be as set forth in the Certificate, until such time as either are changed in accordance with the Act.

2.6.    Members. The name, present mailing address, Initial Capital Contribution and Percentage Interests as of the date hereof of each Member are set forth on Schedule A, as such Schedule A may be amended from time to time in accordance with the terms of this Agreement.

2.7.    Term. The term of the Company commenced at the time the Certificate was marked "Filed" by the Secretary of State, and shall continue in existence in perpetuity unless its existence is sooner terminated pursuant to Article 7 hereof.

2.8.    No State Law Partnership. The Members intend that the Company shall not be a partnership and that no Member shall be a partner of any other Member, for any purposes other than federal, state and local tax purposes, and the provisions of this Agreement shall not be construed otherwise.

## ARTICLE 3
## INTERESTS AND CAPITAL CONTRIBUTIONS

3.1.    Interests.  The Interests owned by the respective Members are reflected as their respective Percentage Interests set forth on Schedule A attached hereto, as amended from time to time in accordance herewith.  The Interests shall initially consist of (i) Class A Interests which have been issued to certain Members in the Percentage Interests set forth opposite the names of the Members in Schedule A in exchange for the Capital Contributions from the Members set forth therein under the heading "Initial Capital Contributions" (the "Initial Capital Contributions") and (ii) Class B Interests which have been issued to certain Members in the Percentage Interests set forth opposite the names of the Members in Schedule A.  Upon the issuance or Transfer of Interests or Membership Rights in accordance with this Agreement, the Managers shall revise Schedule A consistent therewith.

3.2.    Additional Capital Contributions.

(a)    No Member shall be required to make an additional Capital Contribution ("Additional Capital Contribution") without such Member's consent. With the Member's consent, such Member may make an Additional Capital Contribution as determined by the Managers. None of the terms, covenants, obligations or rights contained in  this Section is or shall be deemed to be for the benefit of any Person other than the Members and the Company, and no such third party shall under any circumstances have any right to compel any actions or payments by the Managers and/or the Members.

(b)    The Managers shall have the right to have the Company obtain funds through loans having such terms and conditions as the Managers may determine in the Managers' reasonable discretion. No Member shall be obligated to make any Additional Capital Contribution or loan to the Company except as otherwise agreed by the Company and the applicable Member.

3.3.    Return of Capital Contributions. No Member shall be entitled to receive any interest on its Capital Contributions. Subject to Article 7, the Member shall not have the right to demand return of their Capital Contributions, nor shall the Member have a right to demand and receive property other than cash in return for their Capital Contributions.

3.4.    Representations. Warranties and Covenants of the Members. Each Member hereby represents, warrants and covenants to the Company and acknowledges that: (i) such Member has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (ii) such Member has reviewed and evaluated all information necessary to assess the merits and risks of its investment in the Company; (iii) such Member recognizes that the Company is a highly speculative venture involving a high degree of financial risk, and such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iv) such Member is acquiring its Interests for investment only and not

16

with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (v) the Interests have not been registered under the Securities Act or the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified, or an exemption from such registration and qualification requirements is available, under the Securities Act and other applicable securities laws and the provisions of this Agreement have been complied with; (vi) the Interests were not offered by any means of general solicitation or general advertising, and no representation, warranty or written communication with respect to the Interests were made to such Member, and in entering into this transaction such Member is not relying upon any information other than that contained in this Agreement and the results of its own independent investigation; (vii) the execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained, and do not contravene or result in a default under any provision of any constitution, statute, rule, law or regulation, or any injunction, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency or court applicable to such Member or the charter, bylaws or other governing documents of such Member or any agreement, contract, lease, license or instrument to which such Member is a party or by which such Member or its assets are bound; (viii) the determination of such Member to acquire Interests has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such acquisition or as to the properties, business, prospects or condition (financial or otherwise) of the Company which may have been made or given by any other Member or by any agent or employee of any other Member; (ix) there are substantial restrictions on the transferability of the Interests; (x) Member have no rights to require the Interests to be registered under the Securities Act or the securities laws of any state; (xi) there currently is no, and it is anticipated that there will never be any, public market for the Interests; (xii) it may not be possible for such Member to liquidate such Member's investment in the Company and, accordingly, such Member may have to hold the Interests and bear the economic risk of this investment indefinitely; (xiii) such Member has been advised to consult with such Member's own attorney regarding legal matters concerning the Company and to consult with such Member's tax advisor regarding the tax consequences of investing in the Company; (xi) this Agreement constitutes the valid and legally binding obligation of such Member, enforceable against such Member in accordance with its terms; (xv) such Member has the full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and perform its obligations hereunder; (xvi) such Member is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation (or other formation); and (xvii) such Member need not give any notice to, make any filing with, or obtain any consent, authorization or approval of any government or governmental agency in order to enter into or consummate the transactions contemplated by this Agreement. The representations and warranties set forth in this Section 3.6 shall be deemed to be continuing with respect to each Member during the period in which such Member remains a Member. Each Member acknowledges and agrees that any breach of the representations and warranties set forth in this Section 3.6 shall be deemed to be a material breach of this Agreement. Each Member agrees that such Member will immediately notify the Managers (x) if it is the subject of any action, suit, claim, complaint, investigation, inquiry or proceeding related to any representation or warranty set forth in this Section 3.6, or (y) if, to the knowledge of any such Member, any of such Member's representations and warranties contained herein become inaccurate or untrue in any material respect.

    3.5. <u>Personal Investments in Internal Trading and/or Fund Strategies</u>. Members shall

have the right, but not the obligation, to invest directly in the Company's and/or affiliated trading strategies (funds, separately managed accounts, affiliate accounts, etc.) when excess capacity is available. Capacity amounts for each such strategy will be determined by Management Committee from time to time. After making such a determination, the Management Committee may send a notice to no fewer than all of the Members (each, an "Excess Capacity Notice") stating (i) the amount of such excess capacity, (ii) the date by which each Member must respond to exercise its right hereunder to invest in such excess capacity (the "Exercise Date") and (iii) such other terms and conditions applicable to the investment. Upon receipt of such Excess Capacity Notice, each Member shall have a right to invest up to such Member's respective Percentage Interest of such excess capacity. If any Member fails to respond by the Exercise Date or elects by notice to the Management Committee to invest less than its Percentage Interest of such excess capacity (the "Opted Out Member"), the amount of such excess capacity remaining as a result of the failure or election of such Opted Out Member shall be made available by the Management Committee to the Members other than the Opted Out Member on a pro rata basis in accordance with their relative Percentage Interests. If an Opted Out Member later elects to make an investment in the excess capacity for a strategy which it was previously offered in an Excess Capacity Notice but in which it failed or elected not to invest in, the Management Committee shall cause the other Members' investments in such excess capacity to be redeemed (on a pro rata basis in accordance with their initial investments therein) to the extent required to accommodate the formerly Opted Out Member's investment, which investment shall not in any event exceed the amount originally offered to the formerly Opted Out Member in such Excess Capacity Notice.

3.6.     Treatment of Class B Interests as Profits Interests.

(a)     The Company and each Member hereby acknowledge and agree that, with respect to any Person, such Person's Class B Interests constitute a "profits interest" in the Company within the meaning of Rev. Proc. 93-27 (a "Profits Interest"), and that any and all Class B Interests received by such Person are received in exchange for the provision of services by such Person to or for the benefit of the Company in the capacity of or in anticipation of becoming a service provider to the Company. The Company and any such Person who receives Class B Interests hereby agree to comply with the provisions of Rev. Proc. 2001-43, and neither the Company nor any such Person who receives Class B Interests shall perform any act or take any position inconsistent with the application of Rev. Proc. 2001-43 or any future Internal Revenue Service guidance or other governmental authority that supplements or supersedes the foregoing Revenue Procedures (including such regulations or authoritative guidance as may be issued with respect to Proposed Regulations Section 1.83-3(*l*) and Notice 2005-43). Such Class B Interests shall (i) be structured so as to have no liquidation value as of the date of issuance (i.e., have no right to distributions if the assets were sold as a going concern at fair market value as of the issuance date and the proceeds were distributed to the Members in accordance with Section 4.1 hy reason of Section 8.3); and (ii) only participate in any distributions made pursuant to Section 4.1 by reason of Section 8.3) to the extent such Class B Interests are vested Class B Units and have not been forfeited pursuant to Section 3.6(b) or as determined under the terms of any grant agreement with respect to such Class B Interests.

(b)     Except as otherwise stated in any applicable agreement relating to the Class B Interests by and between the Company and the holders thereof, if any holder of such

18

Class B Interests ceases to provide services to the Company (for any reason or no reason at all), then (i) all unvested Class B Interests of such Person shall be immediately and automatically forfeited effective the date on which Person ceases to provide services and (ii) if such Member is terminated for Cause or breaches any of the Restrictive Covenants, then all vested Class B Interests of such Person shall be immediately and automatically forfeited as of the date of such termination or breach, as applicable. Any Class B Interest forfeited pursuant to this Section 3.6(b) shall be immediately and automatically cancelled, and shall cease thereafter to be outstanding upon such forfeiture. For purpose of this Section 3.6(b) the term "Cause" shall mean (i) the definition of "cause," "for cause" or its equivalent contained in any [Class B Interest Grant Agreement or] written employment contract applicable between the Company and the holder of a Class B Interest or (ii) in the absence of a written employment agreement, the termination by the Company of or cessation of the provision of services to the Company by such holder due to conduct of such holder characterized by gross negligence, willful or wanton misconduct or criminal acts with respect to financial matters.

(c)    Except as otherwise determined by the Managers, both the Company and all Members shall (A) treat such Class B Interests as outstanding for tax purposes, (B) treat a holder of such Class B Interests as a partner for tax purposes with respect to such Class B Interests and (C) file all tax returns and reports consistently with the foregoing. Neither the Company nor any of its Members shall deduct any amount (as wages, compensation or otherwise) with respect to the receipt of such Class B Profits Units for federal income tax purposes. Each service provider that receives Class B Interests that are substantially nonvested for purposes of Code Section 83(b) shall make a timely and effective election under Code Section 83(b) with respect to such Class B Interests and shall promptly provide a copy to the Company. The Company and the Members hereby acknowledges that all of the Class B Interests issued as of the date hereof and set forth on Schedule A are fully vested for all purposes of this Agreement.

## ARTICLE 4
## DISTRIBUTIONS

4.1.    Distributions to Members. Subject to Section 4.3 and Section 4.6, the Managers shall have the right, in the Managers' sole discretion from time to time, to make distributions of Net Cash Flow. In each such case, such distributions shall he made as follows:

(a)    first, to the Members who have made Additional Capital Contributions, pro rata based on such Members' respective Unreturned Additional Capital, until the amount of each Member's Unreturned Additional Capital has been reduced to zero;

(b)    second, to the holders of Class A Interests who have made Initial Capital Contributions, pro rata based on such holders' respective Unreturned Initial Capital, until the amount of each Member's Unreturned Initial Capital has been reduced to zero; and

(c)    thereafter, subject to Section 8.3, to the Members in accordance with the Members' then applicable Percentage Interests.

4.2.    Tax Distributions. Notwithstanding anything to the contrary contained herein, if the Members are subject to federal and state income taxes with respect to the Members' respective share of Company taxable income, and if such taxes exceed the Net Cash Flow distributed to the Members by the Company, then, to the extent of the available Net Cash Flow of the Company, the Company shall distribute to the Members an amount sufficient to enable the Members to pay their federal and state tax liabilities with respect to the Members' respective share of Company taxable income. Any amount distributed to a Member pursuant to this Section 4.2 shall reduce the amount such Member would otherwise be entitled to receive pursuant to Section 4.1.

4.3.    Limitation on Distributions. Notwithstanding anything to the contrary contained herein, no distribution of Net Cash Flow shall be declared or made which shall impair the capital of the Company, nor shall any distribution of Net Cash Flow be made to any Member, unless (i) the aggregate value of the assets of the Company remaining after such distribution is at least equal to the aggregate of its debts and liabilities, including capital, (ii) payment thereof would not be prohibited by Applicable Law and (iii) payment thereof would not violate any restrictions contained in credit facilities to which the Company may then be a party or otherwise bound. The Managers' good faith determination of the restrictions and limitations set forth in the preceding sentence shall be final and conclusive as to all Members.

4.4.    Withholding. Notwithstanding anything to the contrary contained in the Agreement or herein, in the event that any state, local or other income tax imposed on the Company as an entity is reduced by reason of the holding of an Interest by any Member, no part of the expense of the Company for such tax shall be allocated to such Member. In addition, if the Company is obligated under Applicable Law to pay any amount to a governmental agency because of a Member's status as a Member of the Company for federal or state withholding taxes, such amount shall be treated as an advance against and reduce the distributions which would otherwise be made to such Member pursuant to Article 4 of this Agreement. An amount described in the immediately preceding sentence shall be considered withheld by the Company if remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Managers as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. Each Member shall indemnify the Company and the other Members for any liability they may incur for under-withholding of taxes in respect of such Member. Each Member agrees that none of the Company, the Managers or any other Member shall be liable for any excess taxes withheld and that, in the event of over-withholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority.

4.5.    Member Accounts. To the extent any distributions are made to Members in accordance with this Agreement, the Members acknowledge such distributions may be made to the Members' Holdback Accounts or such other accounts as Members may direct.

4.6.    [Special Distributions. Notwithstanding any other provision of this Agreement, the Management Committee may from time to time at its sole discretion approve the making of distributions of Net Cash Flow to the holders of Class B Interests (pro rata in accordance to their relative Class B Interests) prior to making any other distributions to be made in accordance with Section 4.1 (the "Special Distributions"), provided (i) such distributions shall be treated as an

advance against and reduce the distributions which would otherwise be made to such Member pursuant to Article 4 of this Agreement and (ii) any distributions of Net Cash Flow that succeed a Special Contribution may at the discretion of the Management Committee be made solely to the holders of the Class A Interests (pro rata in accordance to their relative Class A Interests) (the "Catch-Up Distributions") until the difference between the sum of all Special Distributions and the Catch-Up Distributions equals zero.]

## ARTICLE 5
## PROFITS AND LOSSES

5.1.    Allocation of Profits and Losses. Except as hereinafter provided in this Article 5, after adjusting each Member's Capital Account for all Capital Contributions, distributions and all special allocations with respect to each accounting period, Profits and Losses for such accounting period shall be allocated among the Members in such manner that, as of the end of such accounting period, the Capital Account of each Member shall be equal to (a) the respective net amount, positive or negative, which would be distributed to such Member (if positive) or for which such Member would be liable to the Company (if negative and if such Member would be so liable under this Agreement), determined as if the Company were to sell all of the assets of the Company for an amount equal to their Gross Asset Value and liquidate in accordance with Section 7.3 minus (b) the sum of such Member's share of Company Minimum Gain (as determined according to Regulation Sections 1.704-2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according to Regulation Section 1.704-2(i)), each as computed immediately prior to the hypothetical sale described in this Section 5.1. It is the intent of the Members that the foregoing allocations will meet the requirements for "substantial economic effect" of Section 704 of the Code, and the Treasury Regulations promulgated thereunder. The allocations set forth in this Article 5 shall be interpreted consistently with the foregoing intent and the allocations shall be amended, if necessary, in order to accomplish this purpose.

5.2.    Loss Limitation. Notwithstanding any provision of Section 5.1 to the contrary, no allocation of Losses shall be made to a Member if it would cause such Member to have an Adjusted Capital Account Deficit. Allocations of Losses (and items thereof) that would be made to a Member but for this Section 5.2 shall instead be made to other Members pursuant to Sections 5.1 to the extent not inconsistent with this Section 5.2.

5.3.    Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain in any year, each Member will be allocated items of income and gain for the year equal to such Member's share of the net decrease in "partnership minimum gain" within the meaning of Regulation Section 1.704-2(g)(2). The Company's minimum gain shall be determined as provided in Regulation Section 1.704-2(d), and a Member's share of Company Minimum Gain shall be determined as provided in Regulation Section 1.704-2(g). This provision is intended to comply with the minimum gain chargeback provisions of Regulation Section 1.704-2(f) and shall be interpreted and applied consistently therewith.

5.4.    Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain in any year, each Member will be allocated items of income and gain for the year equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain within the meaning of Regulation Section 1.704-2(i)(4). The

items to be so allocated shall be determined in accordance with Regulation Section 1.704-2(i)(4) and 1.704-2(j)(2)(ii). This provision is intended to comply with the minimum gain chargeback provisions of Regulation Section 1.704-2(i)(4) and shall be interpreted and applied consistently therewith.

5.5.    Qualified Income Offset. If any Member unexpectedly receives any adjustment, allocation or distribution described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for the year) shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by Regulations, any Adjusted Capital Account Deficit of a Member as quickly as possible; provided that an allocation pursuant to this Section 5.5 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article 5 have been tentatively made as if this Section 5.5 were not in this Agreement. This provision is intended to constitute a "qualified income offset" under Regulation 1.704-1(b)(2)(ii)(d).

5.6.    Nonrecourse Deductions. Nonrecourse Deductions derived from a property held by the Company shall be allocated to the Members in accordance with their respective Percentage Interests with respect to the Company.

5.7.    Member Nonrecourse Deductions. The Company shall allocate Member Nonrecourse Deductions (within the meaning of Regulation Section 1.704-2(i)(2)) solely to the Member who has the economic risk of loss with respect to the Member Nonrecourse Debt related thereto under Regulation Section 1.704-2(i)(1).

5.8.    Curative Allocations. It is the intent of the Members that, to the extent possible, the allocations set forth in the foregoing Sections 5.2 through 5.7 shall be offset with special allocations of other items of Company income, gain, loss and deduction pursuant to this Section 5.8. Therefore, notwithstanding any other provision of this Article 5, the Company shall make such offsetting special allocations of Company income, gain, loss or deduction so that, after such offsetting allocations are made, each Member's Capital Account is, to the extent possible, equal to the Capital Account balance such Member would have had if the allocations set forth in Sections 5.2 through 5.7 were not part of this Agreement. In applying this Section 5.8, the Company shall take into account future allocations under Section 5.3 and Section 5.4 that, although not yet made, are likely to offset other allocations previously made under Section 5.6 and Section 5.7.

5.9.    Allocations for Income Tax Purposes. The income, gains, losses, deductions and credits of the Company for Federal, state and local income tax purposes shall be allocated in the same manner and in the same proportions as the corresponding items entering into the computation of Profits and Losses (and items thereof) were allocated pursuant to Sections 5.1 and 5.2; provided that solely for Federal, state and local income and franchise tax purposes and not for book or Capital Account purposes, income, gain, loss and deduction with respect to property properly carried on the Company's books at a Gross Asset Value other than its tax basis shall be allocated (i) in the case of property contributed in kind, in accordance with the requirements of Section 704(c) of the Code and such Regulations as may be promulgated thereunder from time to time, and (ii) in the case of other property, in accordance with the principles of Section 704(c) of the Code and the Regulations thereunder as incorporated among the requirements of the relevant

provisions of the Regulations under Section 704(b) of the Code.

## ARTICLE 6
## POWERS, RIGHTS AND DUTIES OF THE MANAGER AND MEMBERS

6.1. <u>Management of the Company</u>.

(a) Subject to <u>Sections 6.1(c) and 6.1(i)</u>, the business and affairs of the Company shall be managed under the direction of its Managers (collectively, the "<u>Management Committee</u>"). Except as otherwise specifically provided herein or by Applicable Law, the Management Committee shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as the Management Committee deems necessary or appropriate to accomplish the purposes of the Company as set forth herein (including without limitation the making of decisions affecting investments, distributions and compensation). Without limiting the foregoing:

 (i) the Management Committee shall direct the business and affairs of the Company in such a manner so as to not deviate in any respect from the Trading Risk Factors;

 (ii) the Company shall not commit to a new trade without the approval of the Management Committee; provided, however, beyond the decision to commit to a new trade, trading decisions shall be made by the Company's Head of Trading;

 (iii) the Management Committee will determined the amount which each Member will be required to maintain as a minimum balance in immediately available funds in a bank account accessible by the Company (the "<u>Holding Accounts</u>").

(b) Except as otherwise provided herein or expressly authorized by the Management Committee, no Member of the Company, and no other Person, shall have the authority or power, directly or indirectly, to act as agent of the Company for any purpose, engage in any transaction, make any commitment, enter into any contract or incur any obligation (whether as principal, surety or agent) in the name of the Company or in any other way bind the Company or hold itself out as acting for or on behalf of the Company. Any attempted action in contravention of this Section shall be null, void and not binding upon the Company, unless ratified or authorized in writing by the Managers.

(c) Notwithstanding the foregoing, neither the Company nor the Managers shall take any of the following actions without the unanimous written consent of the Members (collectively, the "<u>Major Decisions</u>"):

 (i) dissolution of the Company pursuant to Article 8 below;

 (ii) any change in the scope of Business of the Company; and

 (iii) any dilution of the Members' Interests.

(d)     The Company shall have one or Managers, who shall be appointed and (subject Section 6.1(i)) removed from time to time by a Majority-in-Interest of the Members in accordance with Section 6.1(f). The Company may, upon the approval of the Majority-in-Interest of the Members, change the number of Managers from time to time. Each Manager shall hold office until a successor is elected or appointed, or until its earlier death, dissolution, termination, resignation or removal. Without limiting the foregoing, the initial Managers of the Company shall be Brock Flagstad ("Flagstad"), Jon Schlossberg ("Schlossberg") and James Streibich.

(e)     Any Manager may resign at any time by giving written notice to the Members. Such resignation shall take effect upon receipt thereof by the Members, unless otherwise specified therein. The acceptance of a resignation shall not be necessary to make it effective.

(f)     Any Manager may be removed from such position with or without cause, at any time, in the discretion of the Majority-in-Interest of the Members.

(g)     A vacancy occurring for any reason with respect to a Manager shall be filled by the Majority-in-Interest of the Members.

(h)     The Managers may from time to time authorize or appoint individuals to act as officers or agents of the Company on a general basis or for a specific purpose, which individuals shall have full power and authority to act for and bind the Company as authorized by the Managers. Each officer or agent of the Company appointed by the Managers shall hold office until his, her or its successor is appointed or until his, her or its earlier death, dissolution, termination, resignation, or removal. Any officer or agent of the Company may resign by written notice to the Company and may be removed for cause or without cause by the Managers in the Managers' sole discretion. Any number of offices may be held by the same Person. Schlossberg is hereby designated as the Company's initial "Head of Trading" authorized hereunder to make such decisions as set forth in Section 6.1(a)(ii).

(i)     The Management Committee will be chaired by one of the Managers (the "Lead Manager"). With respect to any matter submitted or required to be submitted for the approval or consent of the Managers, the affirmative vote of the majority of the Managers, which shall constitute the approval or consent of the Managers; provided, (i) no vote of the Managers on any matter shall be conducted without the vote of the Lead Manager, (ii) no matter shall be submitted to a vote of the Managers, whether pursuant to an in-person or telephonic meeting or (without meeting) by written consent unless such vote has been convened or such consent has been solicited by the Lead Manager. The initial Lead Manager shall be Flagstad. Notwithstanding any other provision of this Agreement to the contrary, Flagstad may not be removed (including without limitation under Section 6.1(d)) from his position as Manager or Lead Manager at any time during which Flagstad holds an Interest with respect to which there is Unreturned Initial Capital or Unreturned Additional Capital. The Lead Manager is hereby authorized and empowered to execute and deliver and cause to be executed or delivered any agreements, certificates, instruments and documents in the name and on behalf of the Company in furtherance of any action authorized, to the extent such authority is required hereunder, by the Management Committee or the Members.

6.2.    Compensation; Reimbursement of Expenses. No Manager or Member shall be

24

entitled to be compensated for any services provided to the Company except as authorized in writing by the Majority-in-Interests of the Members. The Company shall reimburse any Manager for reasonable business expenses incurred by such Manager on behalf of the Company, subject to such substantiation and other reasonable requirements as may from time to time be imposed by the Majority-in-Interests of the Members, which expenses will be treated as expenses of the Company.

6.3. Duties and Time Devoted to Business of the Members; Other Activities; Transactions with Affiliates; No Employment Rights.

(a) Each of the Members, excluding Brock Flagstad, Kasey Klaas, and James Streibich, shall act in the best interests of the Company, devote all such Member's business time and best efforts to the business and affairs of the Company, and the performance of such Member's duties and responsibilities in a diligent and professional manner.

(b) The Members acknowledge and agree that the Managers shall have no duties to the Company or the Members other than those duties expressly described herein and the Managers' fiduciary duties. Subject to the foregoing but notwithstanding any other provision of this Agreement to the contrary or other applicable provision of law or equity, whenever in this Agreement the Managers are permitted or required to make a decision or take an action (i) in their "sole discretion" or "discretion" (or in the "sole discretion" or "discretion" of the Managers) or under a similar grant of authority or latitude, in making such decisions or taking such actions, the Managers shall be entitled to take into account the interests of the Members as a whole or (ii) in "good faith" or under another expressed standard, the Managers shall act under such express standard and shall not be subject to any other or different standard.

(c) Each holder of a Class B Interest hereby acknowledges that in the course of such Member's business activities, such Member may become aware of or learn of business opportunities that are within the scope of the Business of the Company (collectively, "Corporate Opportunities"). Each holder of a Class B Interest hereby acknowledges and agrees that such Member has a duty to make the Company aware of and to offer to the Company all such Corporate Opportunities. Each Member agrees that such Member shall not be entitled to exploit such Corporate Opportunities for such Member's benefit or for the benefit of any of such Members' Affiliates without thereby breaching this Agreement and that the Company shall have all right, title and interest in or to, and it shall have a claim to and against, all revenues and profits arising out of the exploitation of such Corporate Opportunities, whether by a Member or any of such Members' Affiliates. Notwithstanding the generality of the foregoing, any Trading activities conducted by any such holder solely for such Member's own account shall not constitute a "Corporate Opportunity" hereunder.

(d) For purposes of this Agreement, "Business of the Company" means (x) any business involving derivative products and (y) any other business in which the Company has engaged or actively planned to engage during the period in which the applicable Member was a Member of the Company.

(e) No provision of this Agreement shall be deemed to give any Person any right to be employed or engaged by, or continue in the employ or engagement of, the

Company or any of its Affiliates, create any inference as to the length of employment or engagement, affect the right of the Company or its Affiliates to terminate the employment of any at-will employee, or give any Person any right to participate in any employee welfare or benefit plan or other program of the Company or any of its Affiliates.

6.4.    Liability and Indemnification.

(a)     Except as otherwise required by non-waivable provisions of Applicable Law or as expressly set forth in this Agreement, no Member shall have any personal liability whatsoever in such Member's capacity as a Member in excess of its Capital Contribution, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, other than arising out of actions by such Memher prohibited by this Agreement or any actions or liability described in Section 6.5(d).

(b)     None of the Members, the Managers or officers shall be personally liable for the return of any portion of the Capital Contributions (or any return thereon) of the Members and the return, if any, of such Capital Contributions (or any return thereon) shall be made solely from assets of the Company. Except as may be otherwise provided herein, none of the Members shall be required to pay to the Company or any Member any deficit in any Member's Capital Account upon dissolution of the Company or otherwise. None of the Members, the Managers or officers shall be liable, responsible or accountable, in damages or otherwise, to any Member or to the Company for any act performed or omitted to be performed by such Person within the scope of the authority conferred on such Person by this Agreement or by the Managers pursuant to this Agreement, except for such Person's gross negligence, reckless conduct, fraud, bad faith, material breach of this Agreement or violation of Applicable Law.

(c)     Subject to Section 6.5(d), the Company shall, to the fullest extent permitted by the Act, indemnify and hold harmless the Members, Managers and officers and their respective partners, shareholders, members, officers, trustees, advisory board, directors, employees, attorneys and agents and other Affiliates (collectively, the "Indemnified Parties") from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of the their activities on behalf of the Company or in furtherance of the interests of the Company, including any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the investigation and defense of any actual or threatened action, proceeding or claim, unless the acts, omissions or alleged acts or omissions upon which such actual or threatened action, proceeding or claim is based were constituted gross negligence, reckless conduct, fraud, bad faith, a material breach of this Agreement, or a violation of Applicable Law by such Indemnified Party. If any claim for indemnification is based on a claim by a third party (a "Third Party Claim"), the Indemnified Party in question shall give prompt written notice thereof to the Company and shall permit the Company to defend and/or settle such Third Party Claim, so long as it does so diligently and in good faith; provided, however, that no compromise or settlement of

any claim may be effected by the Company without the Indemnified Party's consent (which will not be unreasonably withheld, conditioned or delayed) unless the sole relief provided is monetary damages that are paid in full by the Company. Any such indemnification shall only be from the assets or insurance of the Company and no Member shall be required to contribute capital to the Company to satisfy any such indemnification. Any such indemnification shall be paid by the Company in advance of the final disposition of any such action, proceeding or claim upon receipt of an undertaking by or on behalf of the Indemnified Party seeking advancement to repay the amount advanced should it ultimately be determined that the Indemnified Party was not entitled to be indemnified hereunder or under the Act.

(d)     Each Member shall indemnify and hold harmless the Company and the other Members and its and their respective Affiliates, the Managers, members, officers, directors, employees, agents and representatives from and against any claim, loss, liability, damage, fine, charge, assessment or expense resulting from or arising out of, such Member's (or its owners' or Affiliates') gross negligence, reckless conduct, fraud, bad faith, or material breach of this Agreement, violation of Applicable Law or as provided in any other written agreement between the Company and such Member (or its owner or Affiliate).

6.5.    Covenants of the Members.

(a)     Each Member hereby agrees that, during the period commencing on the date hereof and ending on the date that is eighteen months immediately following the date such Member is no longer a Member of the Company (such period shall be referred to as the "Restricted Period"), such Member shall not, without the prior written consent of the other Member, directly or indirectly, alone or in combination with any other Person, (i) employ, offer employment to, or otherwise attempt to hire, as an employee, consultant, independent contractor or otherwise (or assist any other Person to take any such action regarding), any individual employed or engaged by the Company or any of its Affiliates during the six-month period prior to the date of contact; (ii) solicit an investment (whether a capital investment, debt investment or otherwise) from any Investor or Potential Investor of the Company or its Affiliates; or (iii) otherwise seek to influence or alter any relationship between the Company or any of its Affiliates and any Person referred to in clause (i) or (ii) above.

(b)     Each Member recognizes and acknowledges that such Member will be entrusted with or have access to confidential and proprietary information of the Company, Affiliates of the Company and/or third parties to which the Company or any Affiliate thereof owes a duty of confidentiality (whether pursuant to Applicable Law, by contract or otherwise). Each Member therefore agrees that for so long as he is a Member, and for the longest period of time permitted by law thereafter, such Member shall (i) not, without the prior written consent of the other Member, directly or indirectly use, copy or duplicate, or disclose or otherwise make available to any third party, any Confidential Information (as defined below) other than in the performance such Member's duties with respect to the Company, (ii) take such protective measures as may be reasonably necessary to preserve the secrecy and interest of the Company in the Confidential Information, and (iii) not, without the prior written consent of the other Member, utilize or convert Confidential Information for such Member's own benefit or gain, of whatever nature other than

27

(x) in performance of such Member's duties to the Company (whether as a Manager, Member or otherwise) or (y) in connection with such Member's Trading for his own account. Upon ceasing to be a Member for any reason whatsoever, each Member shall use reasonable efforts to promptly (i) delete or cause to be deleted any Confidential Information held in electronic format and (ii) deliver or cause to be delivered to the Company any and all other tangible Confidential Information in each case in such Member's possession, custody or control. As used herein, the term "Confidential Information" shall mean trade secrets and other non-public information, whether tangible or intangible, in any form or medium, relating to the business or affairs of the Company or its Affiliates that is proprietary to the Company or its Affiliates and which the Company or its Affiliates make reasonable efforts to keep confidential, including, but not limited to, relationships with, and contact information of, Investors and Prospective Investors, materials, research, systems, plans and procedures of or relating to the Company or its Affiliates, databases, software and enhancements thereto, processes, Trading or investment strategies and methodologies, Trading or investment systems, financial products or risk management models, revenue models, manuals, confidential reports, quantitative and other strategies and methodologies, procedures, techniques, discoveries and concepts, financial products and investment positions of the Company or its Affiliates, business plans and strategies, pricing and other financial information, marketing plans, advertising, names, addresses and other information regarding all past, existing Investors and Prospective Investors, vendors and suppliers of the Company or its Affiliates and any confidential information of any such Investors, vendors or suppliers, contractual arrangements, personnel records and other information relating to employees, training materials, statistical data, the source code of the Work, if applicable, and any other non-public information or data comprising or related to the Work, and other proprietary technologies and processes, source code, specifications, inventions, designs, developments of the Company or its Affiliates and other proprietary information used by the Company or its Affiliates in connection with their respective businesses and/or which the Company or any of its Affiliates is obligated to any third party to maintain as confidential. The Members acknowledge that the Confidential Information is vital, sensitive, confidential and proprietary to the Company.

(c)     Upon the Company's request, any Member who has notified the Company of his or her resignation or has been terminated by the Company shall agree to a "garden leave" for a period not to exceed twelve (12) months, as determined by the Management Committee, during which period such Member shall (i) provide services to the Company from a remote location, (ii) refrain from providing services to any Person other than the Company, (iii) adhere to the other provisions of this Section 6.5 and (iv) be entitled to compensation commensurate with the services provided.

(d)     While the restrictions set forth in this Section 6.5 are considered by the Members to be reasonable in all circumstances, it is agreed that if any court of competent jurisdiction shall deem such restrictions to go beyond that which is reasonable in the circumstances for the protection of the legitimate interests of the Company or the Members, the court shall modify the restrictions at issue to the point of greatest restriction permissible by law.

(e)     The Members acknowledge and agree that the covenants set forth in this Section 6.5 (collectively, the "Restrictive Covenants") are reasonable and necessary for the protection of the Company's business interests, that the Members would not have purchased Interests or entered into this Agreement without such Restrictive Covenants, that irreparable injury

28

will result to the Company and the Members if the Members breach any of the terms of the Restrictive Covenants, and that in the event of any Member's actual or threatened breach of any of the Restrictive Covenants, the Company will have no adequate remedy at law. Each Member accordingly agrees that in the event of any actual or threatened breach by such Member of any of the Restrictive Covenants, the Company and the other Member shall be entitled to immediate temporary injunctive and other equitable relief, without the necessity of showing actual monetary damages or of posting any bond or other security. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of any damages.

6.6.    Intellectual Property.

(a)    Each Member shall disclose to the Company and the other Member all Intellectual Property such Member has, directly or indirectly, alone or jointly, created, conceived, developed, reduced to practice, or caused another to create, conceive, develop or reduce to practice relating to the Business of the Company (such actions, individually and collectively, "Creation" or "Created"), promptly following the Creation of each item thereof and in any event prior to any exploitation thereof.

(b)    Each Member agrees that (i) to the extent permitted by Applicable Law, all such Intellectual Property Created after the date of this Agreement (collectively, the "LLC IP") shall be deemed a "work made for hire" within the meaning of that term under United States Copyright Act, 17 U.S.C. §§ 101 et seq., as amended or superseded, and (ii) the Company shall be deemed the exclusive author of such LLC IP and the exclusive owner of all rights, title and interest in and to such LLC IP in any and all media, languages, territories and jurisdictions throughout the world, now known or hereafter devised.

(c)    Each Member hereby (i) assigns and transfers to the Company, in respect of each item of LLC IP, as of the date of its Creation, any and all rights, title and interest such Member may have or acquire in and to any LLC IP (including any LLC IP not deemed, for whatever reason, to be a work made for hire); and (ii) irrevocably waives and assigns to the Company any and all so-called moral rights or "droit moral" as such Member may have in or with respect to such LLC IP. Each Member hereby represents and warrants (x) it shall not make any grant, pledge, or other disposition in respect of any right, title or interest in or to such LLC IP to any Person other than the Company; and (y) such LLC IP will, unless otherwise authorized by the Company in writing, be an original Creation by such Member and will not improperly use or disclose any trade secret, or confidential information, or other property of any other Person.

(d)    The Company shall have the unrestricted right to use, display, publish, perform, record, copy, broadcast, transmit, distribute, augment, subtract from, modify, distort, translate, transfer, combine with other information or materials, create derivative works based on, sell, or otherwise exploit for any purpose, the LLC IP and any portion thereof, in any manner or media throughout the world, as the Company may in its sole discretion determine. Notwithstanding the foregoing, nothing contained herein will require the Company to exercise or exploit any of the Company's rights in or to the LLC IP.

6.7. Buy-Sell Procedures.

(a) Right of First Offer With Respect to Class A Interests. Notwithstanding other provisions of this Agreement to the contrary, in the event that one or more Members who hold Class A Interests desires to Transfer all or a portion of their Class A Interests (such selling Member or Members, the "Selling Member" and the Interests which it or they desire to Transfer, the "ROFO Interests"), the Selling Member shall deliver to the Management Committee a notice setting forth in reasonable detail the terms (including the amount of consideration) of a proposed Transfer of the ROFO Interests (the "ROFO Notice"). Upon receipt of a ROFO Notice, the Management Committee shall promptly deliver such ROFO Notice to each other Member then holding a Class A Interest (each an "Eligible Member"). At any time during the period ending at 5:00pm (Chicago time) on the [twentieth (20th) day] after an Eligible Member's receipt of a ROFO Notice (the "ROFO Period"), each such Eligible Member, at its option, may advise the Management Committee of its desire to acquire, on the same terms of the proposed sale, an amount of the ROFO Interests, as applicable, equal to the Eligible Member's relative holdings of Class A Interests. In the event that any Eligible Member fails or elects not to exercise all or a portion of its rights under this Section 6.7(a), the remaining Eligible Members will have the option to exercise such Eligible Member's unexercised rights on a pro rata basis (in accordance with their relative holdings of Class A Interests) by notifying the Management Committee at any time during the period ending on the fifth (5th) day following the end of the ROFO Period. An Eligible Member's rights under this Section 6.7(a) will be deemed waived and void with respect to any acquisition of ROFO Interests, as applicable, in connection with any such proposed sale if such Eligible Member fails to deliver written notice committing to purchase the ROFO Interests under the terms of the proposed sale within the ROFO Period or fails to consummate the Transfer of such Interests under the terms of the proposed sale. The Selling Member and Eligible Member shall execute and deliver an interest purchase agreement in connection with such Transfer in a form substantially similar to that attached hereto as Exhibit B and the closing date of such Transfer shall be no later than sixty (60) days after the end of the ROFO Period, or at such time as mutually agreed to by the Selling Member and the Eligible Member (the "ROFO Purchase Closing Date").

(b) Company's Right of Redemption. On the date that the Management Committee has determined (each, a "Determination Date") that (i) a Member who holds a Class A Interest has ceased to be involved in the Company's business (other than by reason of such Member's death or Disability), if no other Member has a right to acquire such Interests under Section 6.7(a) or the Members' rights, if any, thereunder have expired or (ii) a that Member who holds a vested Class B Interest has ceased to provide services to the Company or has been terminated (in each case, for any reason and with or without Cause), the Company shall have the right, but no obligation, to purchase any or all such Class A Interests or Class B Interests (the "Redeemable Interests") from the holder of any such Interest for a an amount equal to (the "Redemption Price") the product of (A) 1X the trailing 12 months of revenue (as of such date) and (B) the Percentage Interest represented by such Interests. The Company may exercise its right to purchase the Redeemable Interests by delivering a notice to the holder of a Redeemable Interest at any time within three hundred sixty-five (365) days of the Determination Date (the "Redemption Notice") and paying the Redemption Price to the holder of such Redeemable Interest within ninety (90) days of the delivery of the Redemption Notice. Upon the receipt by the holder of a Redeemable Interest of the Redemption Price, the entire interest in the Company comprising the Redeemable Interest shall immediately terminate and be cancelled and the Redeemable Interest shall cease to

represent any right, interest or power in the Company or pursuant to this Agreement. Any Member holding such a Redeemable Interest hereby agrees to execute and deliver any such additional documents and instruments as may be necessary to effectuate and further evidence the redemption contemplated in this Section 6.7(b).

## ARTICLE 7
## TRANSFER OF MEMBERSHIP RIGHTS AND INTERESTS; WITHDRAWAL OF MEMBERS

7.1.    <u>Transfers</u>.

(a)    Notwithstanding anything to the contrary contained herein and subject to Section 7.2, (i) no Member may Transfer any Class B Interests except if such Transfer is (x) required by Section 7.4 or (y) made with the prior written consent of the disinterested Managers, which consent may be given or withheld in such disinterested Managers' sole discretion, and (ii) no Member may Transfer any Membership Rights with respect to Class B Interests without the prior written consent of the disinterested Managers, which consent may be given or withheld in the disinterested Managers' sole discretion. Subject to the restrictions set forth in the preceding sentence, any transferee of Interests shall be deemed to be an unadmitted assignee of the transferring Member and shall only be admitted as a Member (and granted Membership Rights) upon the written approval of the Management Committee, which approval may be given or withheld in the Management Committee's sole discretion.

(b)    Each Member agrees that such Member shall, upon the request of the Management Committee, execute such transfer instruments as may reasonably be required by another Member or the Management Committee to Transfer Interests permitted to be Transferred hereunder together with such other documentation as such may be reasonably required, including certificates or other documents to preserve the limited liability of the Members under the laws of the jurisdictions in which the Company is doing business. Each Member further agrees that such Transferring Member will pay all reasonable expenses, including reasonable attorneys' fees and the cost of the preparation, filing and publishing of any amendment to the Certificate or this Agreement, incurred by the Company in connection with such Transfer.

(c)    Each Member hereby acknowledges the reasonableness of the prohibitions contained in this Article 7 in view of the purposes of the Company and the relationship of the Members. Any attempted Transfer in violation of this Article 7 shall be void <u>ab</u> <u>initio</u> and of no force or effect.

(d)    The Transfer of Membership Rights and the admission of a substituted Member shall not be cause for dissolution of the Company.

(e)    Upon the Transfer of any Interests or Membership Rights in accordance with the provisions of this Article 7, <u>Schedule A</u> shall be appropriately amended by the

Managers to reflect the name, present mailing address, Initial Capital Contribution and Percentage Interest of the transferor (if the transferor retained any of its Percentage Interest) and the transferee in such Transfer and the Percentage Interest of the other Members.

7.2. <u>Permitted Transfers</u>. Any Transfer of Interests by a Member approved by the Management Committee pursuant to Section 7.1(a)(i)(y) shall be void and of no further effect unless the following conditions are satisfied:

(a) The Transfer will not require registration of Interests under the Securities Act or any applicable state securities laws and, if requested by another Member, the transferor delivers to the Company an opinion (reasonably acceptable in form and substance to the Managers) of legal counsel reasonably acceptable to the other Member to such effect;

(b) The transferee delivers to the Company a written instrument agreeing to be hound by all the terms of this Agreement and assuming obligations of the transferring Member hereunder, reasonably acceptable in form and substance to the other Member;

(c) The transferee is able to make representations and warranties set forth in Section 3.6;

(d) The Transfer will not result in the Company being treated as an association taxable as a corporation for Federal income tax purposes;

(e) The transferor or the transferee delivers to the Company the transferee's taxpayer identification number and the transferee's initial tax basis in the Interests Transferred (the "<u>Transferred Interests</u>"); and

(f) The Transfer is not prohibited by Applicable Law.

7.3. <u>Voluntary Withdrawal of Members</u>. No Member shall have the right or power to Voluntarily Withdraw from the Company. Any attempted Voluntary Withdrawal shall be void <u>ab initio</u> and of no force or effect. No Member who shall Voluntarily Withdraw shall be entitled to receive, in liquidation of its Interests, pursuant to the Act or otherwise, the fair value of the Member's Interests as of the date of any Voluntary Withdrawal.

7.4. <u>Transfers by Operation of Law, Involuntary Withdrawal or Breach of this Agreement</u>.

(a) Immediately upon the occurrence of (i) an Involuntary Withdrawal, (ii) a Transfer of Interests effected by operation of law which does not constitute an Involuntary Withdrawal (an "<u>Operation of Law Transfer</u>") or (iii) a material breach of this Agreement by a Member (including any attempted Voluntary Withdrawal by such Member), the successor of the withdrawn Member, if any, the transferee of the Operation of Law Transfer and the breaching Member, as applicable, shall not become a Member except as otherwise provided herein, and such

successor Member, transferee of the Operation of Law Transfer and breaching Member, as applicable, shall, subject to Section 7.4(b), have all the rights and be subject to all of the obligations of a Member but shall not be a Member or have any Membership Rights; provided that none of the predecessor or the successor Member, the transferor or transferee of the Operation of Law Transfer or the breaching Member shall be entitled to receive in liquidation of its Interests the fair value of the withdrawn, transferor or breaching Member's Interests as of the date the Member Involuntarily Withdrew from the Company, the date the Operation of Law Transfer is effected or the date such Member materially breached this Agreement, as applicable.

(b)    In the event of the occurrence of an Involuntary Withdrawal, an Operation of Law Transfer or a material breach of this Agreement by a Member, the Company shall have the right, but not the obligation, to purchase from such successor of the withdrawn Member, transferee of the Operation of Law Transfer and breaching Member, as applicable (each such Person is referred to herein as a "Seller"), any or all Interests (x) held by the withdrawing Member, (y) Transferred pursuant to the Operation of Law Transfer or (z) held by the breaching Member (such Interests referred to herein as "Seller Interests") upon the following terms and conditions:

(i)    The foregoing option shall be exercisable by written notice to the Seller provided within six months of the later of (x) the date such Seller Involuntarily Withdrew from the Company, the date of the Operation of Law Transfer or the date such Seller materially breached this Agreement, as applicable, and (y) the date upon which the other Member acquires actual notice of such Withdrawal, Operation of Law Transfer or material breach, as applicable.

(ii)    The purchase price for the Seller Interests shall be equal to the following:

(A)    In the case of an Involuntary Withdrawal of a Member due to the death or Disability of such Member, the Fair Market Value of the Seller Interest (based upon the Seller's Percentage Interest thereof) to be purchased by the Company as of the last day of the month preceding the month in which the Seller Involuntarily Withdrew from the Company due to the death or Disability, as the case may be, of the Seller;

(B)    In the case of an Involuntary Withdrawal of a Member due to an Unauthorized Leave of Absence of such Member, 50% of the Fair Market Value of the Seller Interest (based upon the Seller's Percentage Interest thereof) to be purchased as of the last day of the month preceding the month in which the Seller Involuntarily Withdrew from the Company due to the Unauthorized Leave of Absence.

(C)    In all other cases, the outstanding Capital Account balance of the Seller as of the last day of the month preceding the month in which the Seller Involuntarily Withdrew from the Company, the Operation of Law Transfer is effected or the material breach of this Agreement occurred, as applicable;

(iii)    The aggregate purchase price for the Seller Interests to be purchased pursuant to this Section 7.4(b) shall be paid in cash at the closing of such purchase to the extent of the insurance proceeds, if any, received by the Company from any insurance policy of the life of the deceased Member, if applicable. The balance of such purchase price for the Seller Interests shall be paid by delivery of an unsecured promissory note subordinated and junior in right of payment to all other indebtedness of the Company, with customary terms and conditions, payable in five equal annual installments, with the first installment due on the first anniversary of the closing and the subsequent annual installments due on the successive anniversary dates of the closing. Interest shall accrue from the date of the closing on the balance of the purchase price remaining unpaid from time to time at the LIBOR Rate in effect from time to time, and accrued interest shall be payable together with each annual installment of the purchase price. All or part of the purchase price may be prepaid at any time without penalty or premium. As a condition to the issuance of the subordinated promissory note described above, the payee thereunder agrees to promptly execute, verify, deliver and file any (i) subordination, intercreditor or similar agreement requested by any holder of other indebtedness of the Company and (ii) any other agreement, document or instrument thereafter requested by any holder of other indebtedness of the Company from time to time in connection with such subordination.

(iv)    Seller Interests to be purchased pursuant to this Section 7.4(b) shall be purchased and sold at such place and time as the Company designates. The Company shall give the Seller at least five Business Days' prior written notice of the time, date and place of closing. At the closing, the Seller shall deliver to the Company appropriate duly endorsed transfer instruments reasonably required by the Company to transfer all of the Seller Interests as to which the Company has delivered a notice of its intent to purchase pursuant to this Section 7.4(b), free and clear of all claims, liens and encumbrances from any third parties, together with such other documentation as the other Member may reasonably require, including an agreement containing representations and warranties with respect to due authority, enforceability, no conflicts or violations, no required consents or approvals and valid title to the Transferred Interests, free and clear of all claims, liens or encumbrances of third parties.

(v)    If the Seller fails, for any reason, to tender the documents required for the purchase and sale of the Seller Interests to be purchased by the Company from such Seller at the time and place specified by the Company pursuant to this Section 7.4(h), the Seller shall he deemed to have assigned all its right, title and interest in and to such Seller Interests to the Company, and the Seller shall cease to have any rights with respect to such Seller Interests except only to receive the purchase price therefor as computed pursuant to this Section 7.4(b) upon delivery of such instruments and such Seller Interests shall be cancelled on the Company's books and shall no longer be outstanding.

7.5.    Consequences of Withdrawal. The Voluntary Withdrawal or Involuntary Withdrawal of a Member shall not cause a dissolution of the Company, but the rights of such Member to share in the Profits and Losses of the Company, to receive distributions of Company funds and to assign its Interests pursuant to this Article 7 shall, on the happening of such an event, devolve on such Member's estate, trustee, receiver or other successor, subject to the terms and conditions of this Agreement, including Section 7.4, and the Company shall continue as a limited liability company. The estate, trustee, receiver or other successor, as the case may be, shall be liable for all the obligations of the withdrawn Member. However, such estate, trustee, receiver or other successor shall be deemed to be an unadmitted assignee of the withdrawn Member and shall not become a Member except in accordance with this Article 7.

7.6.    Transferees Bound by Agreement. Any successor or transferee of a Member hereunder shall be subject to and bound by all of the provisions of this Agreement as if such successor or transferee was originally a party to this Agreement.

## ARTICLE 8
## DISSOLUTION, LIQUIDATION, AND TERMINATION OF THE COMPANY

8.1.    Dissolution. The Company shall only be dissolved upon the first to occur of the following:

(a)    The unanimous approval of the Members of the Company; and

(b)    At the time of entry of a decree of judicial dissolution under subsection 4 of Section 180/35-1 of the Act.

8.2.    Procedure for Winding Up.

(a)    In the event of the dissolution of the Company, a Manager appointed by the Management Committee or a liquidating agent appointed by the Managers (the Manager or liquidating agent hereinafter referred to as the "Liquidating Agent"), shall commence to wind up the affairs of the Company and to liquidate the Company's assets. The Members shall continue to share all income, losses and distributions during the period of liquidation in accordance with Articles 4 and 5 above. The Liquidating Agent shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company property pursuant to such liquidation, giving due regard to the activity and condition of the relevant market and general financial and economic conditions. If any assets of the Company are distributed in kind to the Members, those assets shall be valued on the basis of their fair market value, and any Member entitled to any interest in those assets may receive that interest as a tenant-in common with all other Members so entitled. The fair market value of the assets shall be determined by the Liquidating Agent in its reasonable discretion.

(b)    The Liquidating Agent shall have all of the rights and powers with respect to the assets and liabilities of the Company in connection with the liquidation and

35

termination of the Company that the Members and the Managers would have with respect to the assets and liabilities of the Company during the term of the Company, and the Liquidating Agent is hereby expressly authorized and empowered to execute any and all documents necessary or desirable to effectuate the liquidation and termination of the Company and the transfer of any assets.

(c)     Notwithstanding the foregoing, (i) a Liquidating Agent which is not a Member shall not be deemed a Member and shall not have any of the economic interests in the Company of a Member; and such Liquidating Agent shall be compensated for its services to the Company at normal and customary rates for its services to the Company as reasonably determined by the Managers, and (ii) a Liquidating Agent shall not enter into or carry out, or cause the Company to enter into or carry out, any transaction, contract, lease, license or other agreement with any Affiliate of the Liquidating Agent, any Affiliate of a Manager, and/or any Affiliate of any Member, unless the same has been approved by all Members. The Liquidating Agent, if a Manager or Member, shall not be entitled to any compensation for acting as the Liquidating Agent, but shall be entitled to be reimbursed for its expenses as provided in Section 6.2. A Liquidating Agent that is neither a Manager nor a Member shall be entitled to reasonable compensation for its services, as determined by the Managers in the Managers' reasonable discretion.

8.3.    Distributions at Liquidation. The Liquidating Agent shall, as soon as practicable, wind up the affairs of the Company and sell and/or distribute the assets of the Company. The assets of the Company shall be applied in the following order of priority:

(a)     first, to pay the costs and expenses of the winding up, liquidation and termination of the Company;

(b)     second, to creditors of the Company (including Members and their respective Affiliates) in the order of priority provided by law;

(c)     third, to establish reasonable reserves adequate to meet any and all contingent or unforeseen liabilities or obligations of the Company; provided that at the expiration of such period of time as the Liquidating Agent may deem advisable, the balance of such reserves remaining after the payment of such contingencies or liabilities shall be distributed as hereinafter provided; and

(d)     thereafter, in accordance with Section 4.1; provided, however, with respect to any amount distributable under Section 4.1(c) with respect to a liquidation pursuant to this Section 8.3 the amount distributable under Section 4.1(c):

(i) with respect to any Class B Interest shall equal the product of (A) the Percentage Interest represented by such Class B Interest and (B) the excess of (x) the total amount distributable to all Members in connection with any such liquidation over (y) the aggregate fair market value as of the date such Class B Interest was issued of all of the distributions required to be made under Sections 4.1(a) and 4.1(b), as reasonably determined by the Managers and measured;

(ii) with respect to any Class A Interest shall be equal to a pro rata amount (in accordance with the Percentage Interests of the Class A Interests, only) of the excess of (A) the aggregate amount distributable under Section 4.1(c) over (B) the amount distributable under Section 8.3(d).

8.4.   Negative Capital Account. Except if and as may be otherwise provided in this Agreement, no Member shall be obligated to restore a Negative Capital Account.

8.5.   Termination. The Company shall terminate when all property owned by the Company shall have been disposed of and the assets shall have been distributed as provided in Section 8.3. The Liquidating Agent shall then execute (or cause to be executed and cause to be filed articles of dissolution of the Company with the Secretary of State.

## ARTICLE 9
## BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS

9.1.   Bank Accounts. All funds of the Company shall be deposited in an account or accounts maintained in the Company's name at a bank or other financial institution. The Managers shall determine the bank, banks, institution or institutions at which the accounts will be opened and maintained, when such accounts shall be closed, the types of accounts, and the Persons who from time to time will have authority with respect to the accounts and the funds therein.

9.2.   Books and Records. The Managers shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Certificate and this Agreement and all amendments to the Certificate and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state or local tax returns. The accounting and financial books, records and accounts of the Company shall be kept and maintained in accordance with U.S. generally accepted accounting principles consistently applied, unless otherwise agreed by the Managers. Any Member, or its duly authorized representatives, shall be entitled to a copy of the list of names and addresses of the Members, for any purpose reasonably related to its status as a Member or otherwise permitted by Applicable Law. Notwithstanding any other provision of this Agreement to the contrary, each Member and its duly authorized representatives, and the Managers and the Managers' duly authorized representatives, shall be permitted to inspect the books and records of the Company (including without limitation all items referred to in the first three sentences of this Section 9.2) at any reasonable time during normal business hours, and to make extracts and copies thereof (at the expense of the requesting Member or Managers).

9.3.   Annual Accounting Period and Taxable Year. The annual accounting period of the Company shall be its Fiscal Year. The Company's taxable year shall be selected by the Managers, subject to the requirements and limitations of the Code.

9.4.   Reports. The Managers shall use the Manager's reasonable efforts to cause to be sent to each Member:

(a)     within 90 days after the end of each Fiscal Year, the tax information concerning the Company which is necessary to prepare the Member's income tax returns for that Fiscal Year;

(b)     within 90 days after the end of each Fiscal Year, the unaudited financial statements of the Company for such Fiscal Year, including a balance sheet and income statement.

9.5.     Tax Representative. Brock Flagstad is hereby designated as the "partnership representative" of the Company (within the meaning of Section 6223 of the Code, as amended by the Bipartisan Budget Act of 2015 (the "BBA") (the "Tax Representative"), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings (each such examination or proceeding, a "Tax Proceeding"), to expend Company funds for professional services and costs associated therewith, and to make all decisions and take any other actions on behalf of the Company with respect to such Tax Proceedings, including, without limitation, to make any elections permitted to be made by the Company under the BBA. The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings. In furtherance of the foregoing and without further consideration, each Member hereby agrees to execute and deliver such other documents and take such other action as may be reasonably requested by the Tax Representative to implement the decisions made by the Tax Representative in the exercise of its authority under this Section 9.5 to make decisions with respect to any Tax Proceeding.

9.6.     Tax Elections. The Managers shall have the authority to make (and abstain from making) all Company elections permitted under the Code, including elections of methods of depreciation and elections under Code Section 754.

9.7.     Title to Company Property. All real and personal property acquired by the Company shall be acquired and held by the Company in its name.

### ARTICLE 10
### AMENDMENTS AND WAIVERS

10.1.     Amendments and Waivers. A provision of this Agreement may only be amended or waived from time to time by the written agreement of all the Members, except as otherwise provided in Section 10.2.

10.2.     Amendments Without Consent of the Members. In addition to any amendments which may be made by the Members otherwise authorized herein, amendments may be made to this Agreement from time to time by the Management Committee to (a) cure any ambiguity, to correct or supplement any provisions herein which may be inconsistent with any other provision herein, or to add other provisions with respect to matters arising under this Agreement which will not be inconsistent with the provisions of this Agreement; (b) delete or add any provision to this Agreement required to be so deleted or added by any federal or state agency provided such provision is deemed by such agency to be for the benefit or protection of the Members; or (c) better

38

assure, in the reasonable opinion of counsel to the Company, that the Company will continue to be classified as a pass-through entity for purposes of Federal income taxes; provided, however, that no amendment shall be adopted pursuant to this Section 10.2 unless the adoption thereof (i) is for the benefit of or not adverse to the interests of all of the Members; (ii) is consistent with Article 5 hereof; and (iii) does not adversely affect the limited liability of the Members or the status of the Company as a pass-through entity for federal income tax purposes. Additionally, the Managers may, without the consent of the Members (but with prompt written notice thereof to all Members), amend Schedule A from time to time to accurately reflect any additional issuance or Transfer of Interests in accordance with the terms contained herein, the withdrawal of any Member in accordance with the terms contained herein, or the admittance of any new or substituted Member in accordance with the terms contained herein.

## ARTICLE 11
## GENERAL PROVISIONS

11.1.　Uniform Commercial Code. Interests and Membership Rights shall for all purposes be deemed to be a "security" under Articles 8 and 9 of the Uniform Commercial Code as adopted in any applicable jurisdiction.

11.2.　Further Assurances. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Managers deems appropriate (a) to comply with the requirements of Applicable Law for the formation and operation of the Company; and (b) to comply with any Applicable Law relating to the acquisition, operation, or holding of the property of the Company.

11.3.　Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "Notice") required or permitted under this Agreement must be in writing (which shall be deemed to include facsimile and e-mail communications) and either (a) delivered personally, (b) sent by certified or registered mail, postage prepaid, return receipt requested, (c) sent by recognized overnight delivery service (including, without limitation, Federal Express) or (d) sent via facsimile, e-mail or other electronic communication (with confirmation of receipt). A Notice must be addressed to a Member at the Member's address set forth on Schedule A attached hereto (or the facsimile or e-mail address of the Member set forth on Schedule A, if applicable). A Notice to the Company must be addressed to a Manager of the Company at the Manager's address on record with the Company (or the facsimile or e-mail addresses of the Manager on record with the Company, if applicable). A Notice to a Manager must be addressed to the Manager at the Manager's address on record with the Company (or the facsimile or e-mail address of the Manager on record with the Company, if applicable). A Notice that is sent by mail will be deemed given: (i) three Business Days to an address within the United States of America or (ii) seven Business Days to an address outside of the United States of America after it is mailed. A Notice sent by recognized overnight delivery service will be deemed given when received or refused. A Notice sent by facsimile or e-mail will be deemed given on the date received if received prior to 5 p.m. (in the time zone to which sent) or on the next day if received on the preceding day after 5 p.m. (in the time zone to which sent). Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

11.4.   Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other rights and remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach, all (if and to the extent permitted by Applicable Law) without being required to show actual damage or irreparable harm, and (if and to the extent permitted by Applicable Law) without having to furnish any bond or other security.

11.5.   Complete Agreement. This Agreement (including its Schedule and Exhibits), together with any written agreement among all of the Members or between the Company and a Member which is entered into in accordance with and complies with the terms of this Agreement, constitute the complete and exclusive statement of the agreement among the parties hereto with respect to the subject matter hereof. This Agreement supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.

11.6.   Applicable Law; Venue; Attorney's Fees. All questions concerning the construction, validity and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Delaware. Each Member hereby agrees that (a) any and all litigation arising out of this Agreement shall be conducted only in state or Federal courts located in the State of Illinois, and (b) such courts shall have the exclusive jurisdiction to hear and decide such matters. Each Member hereby submits to the personal jurisdiction of such courts and waives any objection such Member may now or hereafter have to venue or that such courts are inconvenient forums. In the event of legal action to interpret or enforce any of the terms or provisions of this Agreement or to recover damages for a breach thereof, the prevailing party shall be entitled to recover reasonable attorney's fees actually incurred plus costs.

11.7.   Section Titles. The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

11.8.   Binding Provisions. This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns

11.9.   No Third Party Beneficiaries. Nothing contained in this Agreement is intended to confer upon any Person, other than the parties hereto and any successors and assigns described herein, any rights or remedies under or by reason of this Agreement.

11.10.   Terms. Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

11.11.   Severability of Provisions. Should any provision of this Agreement be held to be illegal, invalid or unenforceable, or legal, valid and enforceable only if modified, such holding

shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon each party hereto with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties hereto further agree that any court or arbitrator is expressly authorized to modify any such illegal, invalid or unenforceable provision of this Agreement in lieu of severing such illegal, invalid or unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties hereto expressly agree that this Agreement as so modified shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had never been set forth herein.

     11.12. _Counterparts, Facsimile; Reproductions_. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one and the same instrument. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine, PDF or other electronic communication (including without limitation e-mail), shall be treated in all manner and respects and for all purposes as an original agreement and shall be considered to have the same binding legal effect as if it were the original signed version hereof delivered in person. At the request of any party hereto, each other party hereto shall re- execute original forms hereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine, e-mail or other electronic communication to deliver a signature or the fact that any signature was transmitted or communicated through the use of a facsimile machine, e-mail or other electronic communication as a defense to the formation or enforceability of a contract and each such party forever waives any such defense. Upon execution in accordance herewith, this Agreement may be reproduced by any photographic, photostatic, microfilm, optical disk, micro-card, miniature photographic or other similar process, each of which reproduction of this Agreement shall be deemed an original.

**[Remainder of Page Intentionally Left Blank. Signature Pages Follow]**

IN WITNESS WHEREOF, the undersigned have executed the Limited Liability Company Agreement as of the date first written above.

**MEMBERS:**

_____

Brock Flagstad, as representative of
Cloverpoint Holdings, LLC

_____

Kasey Klaas, as representative of
Snapper Holdings, LLC

_____

Jon Schlossberg

_____

Matt Andrews

_____

Rick Sterioti

_____

James Streibich, as representative of
James Streibich Revocable Trust of
2002

**LEAD MANAGER:**

_____

Brock Flagstad

42

## Schedule A

### MEMBERS, INITIAL CAPITAL CONTRIBUTIONS AND PERCENTAGE INTERESTS

| Member's Name and Mailing Address | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Brock Flagstad | $750,000 | 18% (Class A) |
| Kasey Klaas | $750,000 | 18% (Class A) |
| Jon Schlossberg<br>9S711 Brookbank Road<br>Burr Ridge, IL 60527 | $ | 10% (Class A)<br>8% (Class B) |
| Matt Andrews<br>2006 North Hoyne<br>Chicago, IL 60647 | $ | 10% (Class A)<br>8% (Class B) |
| Rick Sterioti<br>833 North Clark Street, #1805<br>Chicago, IL 60610 | $ | 10% (Class A)<br>8% (Class B) |
| James Streibich Revocable Trust of 2002<br>220 E. Walton Street, #11E<br>Chicago, IL 60611 | $2,000,000 | 10% (Class A) |
| | $3,500,000 | 100% |

EXHIBIT B

FORM OF INTEREST PURCHASE AGREEMENT

This INTEREST PURCHASE AGREEMENT ("Agreement"), dated as of _____, 201__, is made and entered into by and between_____ ("Purchaser") and _____ ("Seller"). Capitalized terms not otherwise defined herein shall have the meanings set forth in the Operating Agreement (defined below).

Recitals:

A.      Seller owns certain membership interests ("Seller's Interest") in Folding Light, LLC, a Delaware limited liability company (the "Company"). Purchaser and Seller are parties to that certain Limited Liability Company Agreement of the Company dated as of _____ (the "Operating Agreement"). The purchase and sale contemplated by this Agreement is being consummated pursuant to Section 6.7(a) of the Operating Agreement.

B.      Seller desires to sell, and Purchaser desires to purchase the ROFO Interest ( the "Seller's Interest") on the terms and subject to the conditions set forth in this Agreement and Section 6.7(a) of the Operating Agreement.

Agreements:

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
SALE OF MEMBERSHIP INTERESTS;
PURCHASE PRICE; AND CLOSING

1.1. Purchase and Sale. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, Seller's Interest, free and clear of all Liens and on the terms and subject to the conditions set forth in this Agreement and Section 6.7(a) of the Operating Agreement.

1.2. Purchase Price.

(a) The purchase price ("Purchase Price") for Seller's Interests shall be equal to _____.

(b) Upon the Closing (defined in Section 1.3(a)), Purchaser shall pay to Seller the Purchase Price by wire transfer of immediately available funds to such account as Seller shall direct by written notice delivered to Purchaser.

1.3. Closing.

(a) The transactions contemplated by this Agreement shall be consummated (the "Closing") on the ROFO Closing Purchase Closing Date (as defined in Section 6.7(a) of the Operating Agreement) (or, in the event such day is not a Business Day, on the immediately following Business Day) at the offices of the Company, or at such other time or place, as mutually agreed by the parties. The date on which the Closing occurs in accordance with the preceding sentence is referred to in this Agreement as the "Closing Date".

(b) At the Closing, the following transactions shall be consummated:

    (i) Seller shall sell, convey, assign and transfer to Purchaser Seller's Interest, free and clear of all Liens, by executing and delivering to Purchaser an Assignment and Assumption of Membership Interests in the form attached hereto as Schedule 1 (the "Membership Interest Assignment");

    (ii) Purchaser shall deliver to Seller evidence that all guarantees made by Seller and/or any Affiliate of Seller which have guaranteed any debts or obligations of the Company (collectively, "Seller Guarantees") have been terminated and released or that all such debts and obligations which are so guaranteed have been paid in full.

    (iii) Seller shall execute and deliver a closing certificate executed by Seller, pursuant to which Seller represents and warrants to Purchaser that Seller's representations and warranties to Purchaser set forth herein are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue and in any respect, specifying the respect in which the same is untrue), that all covenants required by the terms hereof to be performed by Seller on or before the Closing, to the extent not waived by Purchaser in writing, have been so performed (or, if any such covenant has not been performed, indicating that such covenant has not been performed), and that all documents to be executed and delivered by Seller at the Closing have been executed by Seller;

    (iv) Purchaser shall execute and deliver a closing certificate executed by Purchaser, pursuant to which Purchaser represents and warrants to Seller that Purchaser's representations and warranties to Seller set forth herein are true and correct as of the Closing Date as if then originally made (or, if any such representation or warranty is untrue and in any respect, specifying the respect in which the same is untrue), that all covenants required by the terms hereof to be performed by Purchaser on or before the Closing, to the extent not waived by Seller in writing, have been so performed (or, if any such covenant has not been performed, indicating that such covenant has not been performed), and that all documents to be executed and delivered by Purchaser at the Closing have been executed by Purchaser; and

    (v) Seller and Purchaser shall each execute and deliver to the other party such documents which are reasonably requested by such other party.

1.4. <u>Further Assurances.</u> After the Closing, each party hereto shall from time to time, at the request of the other party and without further cost or expense to such other party, execute and deliver such other instruments of conveyance and transfer and take such other actions as such other party may reasonably request in order to more effectively consummate the transactions contemplated hereby.

## ARTICLE II
### REPRESENTATIONS AND WARRANTIES OF
### SELLER

As of the date hereof, and as of the Closing Date, Seller represents and warrants to Purchaser as follows:

2.1. <u>Authority.</u> Seller has full power and lawful authority to enter into this Agreement and perform the transactions contemplated hereby. This Agreement constitutes a valid and legally binding obligation of Seller enforceable against Seller in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

2.2. <u>Consents and Approvals.</u> The execution and delivery by Seller of this Agreement and the performance by Seller of the transactions contemplated hereby do not require Seller to obtain any consent, approval or action of, or make any filing with or give any notice to, any Person or any Governmental or Regulatory Body.

2.3. <u>Noncontravention.</u> The execution and delivery by Seller of this Agreement and the performance by Seller of the transactions contemplated hereby will not conflict with or result in any breach of any terms and conditions of, or constitute a default under any Laws or Orders to which Seller is subject or by which Seller may be bound.

2.4. <u>Title to the Seller's Interest.</u> Seller has good and marketable title to Seller's Interest free and clear of all Liens, other than Liens created by or through Purchaser and other than Liens that shall be released as of the Closing. Except for this Agreement, there is no option, warrant, right, call, subscription agreement, commitment or understanding of any nature whatsoever to which Seller is a party that directly or indirectly (i) calls for the sale, pledge or other disposition of Seller's Interest or any portion thereof or (ii) obligates Seller to grant, offer or enter into any of the foregoing.

**ARTICLE III**
REPRESENTATIONS AND WARRANTIES
OF PURCHASER

As of the date hereof, and as of the Closing Date, Purchaser hereby represents and warrants to Seller as follows:

3.1. <u>Authority</u>. Purchaser has full power and lawful authority to enter into this Agreement and perform the transactions contemplated hereby. This Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent that enforcement may be affected by laws relating to bankruptcy, reorganization, insolvency and creditors' rights and by the availability of injunctive relief, specific performance and other equitable remedies.

3.2. <u>Consents and Approvals</u>. The execution and delivery by Purchaser of this Agreement and the performance by Purchaser of the transactions contemplated hereby do not require Purchaser to obtain any consent, approval or action of, or make any filing with or give any notice to, any Person or any Governmental or Regulatory Body.

3.3. <u>Noncontravention.</u> The execution and delivery by Purchaser of this Agreement and the performance by Purchaser of the transactions contemplated hereby will not conflict with or result in any breach of any of the terms and conditions of, or constitute a default under any Laws or Orders to which Purchaser is subject or by which Purchaser may be bound.

**ARTICLE IV**
CONDUCT PRIOR TO THE CLOSING

4.1. <u>General.</u> Seller and Purchaser shall have the rights and obligations with respect to the period between the date hereof and the Closing Date which are set forth in the remainder of this Article IV.

4.2. <u>Purchaser's Obligations.</u> Purchaser shall use its best efforts to obtain the termination and release of the Seller Guarantees.

4.3. <u>Joint Obligations.</u> The following shall apply with equal force to Seller and Purchaser:

(a) Each party shall promptly give the other party written notice upon learning of the existence or occurrence of any condition which would make any representation or warranty herein contained of either party untrue in any material respect or which might reasonably be expected to prevent the consummation of the transactions herein contemplated.

(b) No party shall intentionally perform any action which, if performed, or intentionally omit to perform any action which, if omitted to be performed, would prevent or excuse the performance of this Agreement by any party hereto or which would result in any representation or warranty herein contained of such party

being untrue in any material respect as if originally made on and as of the Closing Date.

## ARTICLE V
CONDITIONS TO CLOSING

5.1. <u>Conditions to Seller's Obligations.</u> The obligation of Seller to consummate the transactions contemplated hereby is subject to fulfillment, or waiver by Seller, of all the following conditions on or prior to the Closing Date. Upon the non-fulfillment of any of the following conditions on or prior to the Closing Date, this Agreement may, at Seller's option and upon prior written notice to Purchaser to prior to the Closing Date, be terminated :

    (a) Each and every representation and warranty made by Purchaser shall have been true and correct in all material respects when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

    (b) All obligations of Purchaser to be performed hereunder through, and including on, the Closing Date shall have been performed in all material respects.

    (c) No suit, proceeding or investigation shall have been commenced or threatened by any Governmental or Regulatory Body or Person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions herein contemplated.

5.2. <u>Conditions to Purchaser's Obligations.</u> The obligation of Purchaser to consummate the transactions contemplated hereby is subject to the fulfillment, or waiver by Purchaser, of all the following conditions on or prior to the Closing Date. Upon the non- fulfillment of any of the following conditions on or prior to the Closing Date, this Agreement may, at Purchaser's option and upon prior written notice to Seller prior to the Closing Date, be terminated:

    (a) Each and every representation and warranty made by Seller shall have been true and correct in all material respects when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date.

    (b) All obligations of Seller to be performed hereunder through, and including on, the Closing Date shall have been performed in all material respects.

    (c) No suit, proceeding or investigation shall have been commenced or threatened by any Governmental or Regulatory Body or Person on any grounds to restrain, enjoin or hinder, or to seek material damages on account of, the consummation of the transactions herein contemplated.

## ARTICLE VI
EFFECT OF TERMINATION/PROCEEDING

6.1.  General. The parties shall have the rights and remedies with respect to the termination and/or enforcement of this Agreement which are set forth in this Article VI.

6.2.  Purchaser's Breach. If the failure to close as of the Closing Date was caused by Purchaser's breach of this Agreement (which breach was not cured within five Business Days of written notice thereof), Seller shall be entitled to purchase Purchaser's membership interests in the Company as provided in Section 6.8 of the Operating Agreement as Seller's sole remedy.

6.3.  Seller's Breach. If the failure to close as of the Closing Date was caused by Seller's breach of this Agreement (which breach was not cured within five Business Days of written notice thereof), (x) Purchaser may, in addition to Purchaser's rights set forth in Section 6.8 of the Operating Agreement, pursue specific performance and (y) Purchaser shall be entitled to recover its costs and expenses which are incurred in connection with the transactions contemplated by this Agreement and in pursuing its rights and remedies (including reasonable attorneys' fees) in connection therewith. Seller hereby appoints Purchaser as Seller's agent and attorney-in-fact to execute, deliver and file any and all documents and agreements, and to do all other lawfully permitted acts, to effect the purchase and sale contemplated in Section 6.8 of the Operating Agreement.

**ARTICLE VII**
MUTUAL GENERAL RELEASE

7.1. General Release of Purchaser.

(a)  Seller, for itself and on behalf of its legal representatives, parents, subsidiaries, members, managers, officers, employees, agents, successors and assigns, hereby releases and discharges Purchaser and the Company and their respective legal representatives, members, managers, officers, employees, agents, representatives, successors and assigns, from any and all claims, demands, actions, causes of action, oral and written agreements, suits, costs, damages, expenses, compensation, penalties, liabilities and obligations of any kind or nature, whether in law or equity, whatsoever, known or unknown, direct or consequential, foreseen or unforeseen, matured or arising at any time relating to the Company, the Project (as defined in the Operating Agreement) and/or the Operating Agreement; provided that, notwithstanding anything in this Agreement to the contrary, such releases and waivers shall not apply to a breach of this Agreement or to the extent any such releases or waivers cannot be granted as a matter of law.

(b)  Seller acknowledges that it has had the opportunity to obtain legal counsel with respect to, and understand the terms and effect of, this release, and enters into it freely, and without coercion, and further that its execution and delivery of this release is not the result of any fraud or mistake known to Seller, duress, or undue influence of any kind or nature whatsoever.

7.2. General Release of Seller.

(a)  Purchaser, for itself and on behalf of its legal representatives, heirs, parents,

subsidiaries, shareholders, members, partners, managers, directors, officers, employees, agents, representatives, successors and assigns, hereby releases and discharges Seller and its legal representatives, members, managers, employees, agents, successors and assigns, from any and all claims, demands, actions, causes of action, oral and written agreements, suits, costs, damages, expenses, compensation, penalties, liabilities and obligations of any kind or nature, whether in law or equity, whatsoever, known or unknown, direct or consequential, foreseen or unforeseen, matured or arising at any time relating to the Company, the Project and/or the Operating Agreement; provided that, notwithstanding anything in this Agreement to the contrary, such releases and waivers shall not apply to a breach of this Agreement or to the extent any such releases or waivers cannot be granted as a matter of law.

(b) Purchaser acknowledges that it has had the opportunity to obtain legal counsel with respect to, and understand the terms and effect of, this release, and enters into it freely, and without coercion, and further that its execution and delivery of this release is not the result of any fraud or mistake known to it, duress, or undue influence of any kind or nature whatsoever.

## ARTICLE VIII
### MISCELLANEOUS

8.1. <u>Notices.</u> Any notice or other communication required or permitted hereunder shall be in writing and shall be delivered personally, sent by first class mail, postage prepaid, sent by facsimile transmission (with confirmation of receipt) or sent by means of overnight delivery to the addresses set forth in the Operating Agreement. Any party may by notice given in accordance with this Section 8.1 to the other parties (i) designate another address or Person for receipt of notices hereunder or (ii) change its address, facsimile number or other information for the purpose of notices to that party. All such notices, requests and other communications will (i) if delivered personally to the address as provided in this Section 8.1, be deemed given upon delivery, (ii) if delivered by facsimile transmission to the facsimile number as provided in this Section 8.1, be deemed given upon receipt of a legible copy thereof and (iii) if delivered by overnight delivery in the manner described above to the address as provided in this Section 8.1, be deemed given upon receipt.

8.2. <u>Certain Definitions.</u> For the purposes of this Agreement, the following terms have the following meanings:

(a) <u>"Affiliate"</u> means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by or is under common control with such Person (the term "control," for purposes of this definition, means the power to direct or cause the direction of the management or policies of the controlled Person).

(b) <u>"Business Day"</u> means any day other than Saturday, Sunday or any legal holiday observed in the State of Illinois.

(c) <u>"Governmental or Regulatory Body"</u> means any government or political subdivision thereof, including any judicial or administrative body, whether federal, state, local or foreign, or any agency or instrumentality thereof and any arbitration

panel or tribunal.

(d) "Law" means any statute, law, rule, regulation or ordinance imposed by any Governmental or Regulatory Body in effect on or prior to the Closing Date.

(e) "Lien" means any lien, claim, encumbrance, title defect, pledge, mortgage, security interest or charge of any kind.

(f) "Order" means any judgment, decree, award, injunction or governmental order imposed by any Governmental or Regulatory Body.

(g) "Person" means an individual, corporation, joint venture, partnership, limited liability company, trust, unincorporated association, government or any department or agency thereof or any other entity.

8.3. Expenses. Each party to this Agreement shall bear its own expenses with respect to the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby.

8.4. Entire Agreement. This Agreement, including the Schedules hereto, and any collateral documents and instruments executed in connection with the consummation of the transactions contemplated hereby contain the entire agreement among the parties with respect to the transactions contemplated hereby, and supersede all prior agreements, written or oral, with respect thereto.

8.5. Amendment and Modification. This Agreement may be amended, modified or supplemented only by a written agreement signed by all the parties hereto.

8.6. Waiver of Compliance; Consents. Any failure of any party hereto to comply with any obligation, covenant, agreement or condition herein may be waived by the other parties, by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

8.7. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the state of Illinois applicable to agreements made and to be performed entirely within such state.

8.8. Binding Effect; Assignment; No Third-Party Beneficiary. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, legal representatives and permitted assigns. This Agreement is not assignable, in whole or in part, by any party without the written consent of the other party; provided, that Purchaser may assign this Agreement to an Affiliate of Purchaser (in which case, Purchaser shall remain liable hereunder).

8.9. Variations in Pronouns. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require.

8.10. <u>Counterparts.</u> This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

8.11. <u>Headings.</u> The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

8.12. <u>Invalid Provisions.</u> If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

8.13. <u>Litigation.</u> The parties agree that the terms of this Agreement shall be enforced in the Circuit Court sitting in Cook County, Illinois. The parties agree that Cook County shall be the exclusive jurisdiction and forum for any dispute arising under this Agreement. The prevailing party shall be entitled to recover from the non-prevailing party reasonable attorneys' fees and costs as allowed by law.

8.14. <u>Time is of Essence.</u> The parties agree that time is of essence in the performance of their obligations hereunder.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PURCHASER:

_____

By: _____
Its: _____


SELLER:

_____

By: _____
Its: _____

<u>Schedule 1</u>

<u>ASSIGNMENT AND ASSUMPTION OF MEMBERSHIP INTERESTS</u>

This Assignment and Assumption of Membership Interests (this "Assignment") is dated as of _____, 201____and is made by_____("Assignor") to _____("Assignee").

<u>Recitals</u>

A. Assignor is the owner of a membership interest ("Assignor's Interest") Folding Light, LLC, a Delaware limited liability company (the "Company").

B. Assignor has agreed to assign, convey and set over unto Assignee, and Assignee has agreed to accept and assume, all of Assignor's Interest in the Company (the "Assigned Interest"), on the terms and conditions herein provided.

NOW, THEREFORE, in consideration of XXX and No /100 DOLLARS ($XXX.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, Assignor and Assignee hereby agree as follows:

1. Recitals. The foregoing recitals are acknowledged to be accurate and are incorporated herein by reference.

2. Assignment. Assignor hereby sells, assigns, transfers, grants, conveys, contributes, sets over and delivers unto Assignee all Assignor's right, title and interest in and to the Assigned Interest in the Company.

3. Acceptance and Assumption of Assignor's Assignment. Assignee hereby acknowledges and accepts the foregoing assignment, together with all rights, privileges, benefits, duties, obligations and liabilities arising therefrom or in connection therewith.

4. Binding Effect. This Assignment shall be binding upon the parties hereto and shall inure to the benefit of their respective successors and assigns.

5. Counterparts. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and same instrument.

IN WITNESS WHEREOF, Assignor and Assignee have caused this Assignment to be duly executed on the date set forth above.

ASSIGNOR:

_____

By: _____
Its: _____


ASSIGNEE:

_____

By: _____
Its: _____